LACKAWANNA IRON & COAL CO. et al. v. FARMERS' LOAN & TRUST CO. et al.

(Circuit Court of Appeals, Fifth Circuit. February 25, 1897.)

No. 503.

RAILROADS—APPOINTMENT OF RECEIVER—DEBTS ENTITLED TO PREFERENCE.
      The purchase by a railroad company, under contracts made from about sixteen months to over two years before the appointment of a receiver, of some 20,000 tons of steel rails, to replace the old and deteriorated rails with which its tracks were laid, to be paid for by its notes, due in six months, renewable for six months longer at the railroad company's option, is not a purchase of supplies in the ordinary operation of the road to keep it a going concern, so as to authorize the court appointing the receiver to give the debt a preference over the mortgage debt.

Appeal from the Circuit Court of the United States for the Eastern District of Texas.

On February 16, 1885, the Southern Development Company filed its bill of complaint in the United States circuit court for the Eastern district of Texas against the Houston & Texas Central Railway Company, in a cause known as "Cause No. 185" of the equity docket of that court. The complainant alleged that the railway company was indebted to it in the sum of about $600,000 for money loaned at various times, and prayed for the appointment of a receiver. On February 21, 1885, receivers were appointed, and they took possession of all the property of the railway company. On April 18, 1885, the Southern Development Company filed its supplemental and amended bill in cause No. 185, whereby it made N. S. Easton and James Rintoul and the Farmers' Loan & Trust Company defendants in their capacity of trustees of the various mortgages on the property of the railway company. The Southern Development Company further prayed by said supplemental and amended bill that an account be taken of the several amounts due it by said railway company, as also of all sums due to all the other creditors of said railway company who

might intervene for the protection of their claims. An accounting was also asked of all amounts paid by the railway company to any of its mortgagees or bondholders, of all amounts paid for interest on bonds and of other items specified in the pleadings. The Southern Development Company prayed that the amounts which the accounting would show it to be entitled to, be declared liens on the net earnings of the railway company and upon all its property, superior in rank to the claims of the trustees and to the mortgage bonds and coupons issued under various deeds of trust executed by said railway company. On September 12, 1885, the Lackawanna Company intervened in cause No. 185, and prayed that an account be had of the sum which the railway company owed it on certain contracts to be hereinafter mentioned more fully, and that its claim be decreed to be paid out of the net revenues of the railway company, and declared to be a lien thereon superior in rank to the claim of the trustees and mortgage bonds and coupons. The bill of complaint of the Southern Development Company in cause No. 185 was, upon the demurrer of the trustees, dismissed on May 27, 1886, without prejudice to the rights of complainants to assert their rights, if any they had. The decree discharged the receivers in cause No. 185. They were ordered to turn over all the property of the railway company to other receivers, who had theretofore, in causes known as equity causes Nos. 198, 199, and 201 of the docket of said court, been appointed joint receivers of the property of the railway company, on the application of the trustees under various deeds of trust bearing on the property. The receivers in cause No. 185 delivered possession of the property to the receivers in causes Nos. 198, 199, and 201 on July 10, 1886. The three causes Nos. 198, 199, and 201 were consolidated as "Consolidated Cause No. 198." In this cause, the Lackawanna Company, on November 26, 1886, filed its intervention, praying substantially for the same relief it had prayed for in cause No. 185. A final decree of foreclosure was rendered in cause No. 198 on May 4, 1888, and, on September 8, 1888, all the property of the railway company was sold and one George E. Downs became the purchaser of the Waco & Northwestern Division of the railway company. But his purchase was made subject to the mortgage which was subsequently foreclosed in equity cause No. 227 of the docket of said court, and subject also to the right which the court reserved to charge upon the property the payment of any amount that might be found due by reason of intervening petitions pending in cause No. 198, and which might be found to be entitled to priority over the mortgage in that cause. The mortgage foreclosed in cause No. 227 is known as the "Waco and Northwestern Division First Mortgage," and is a different mortgage from the mortgages upon which the other causes were based. It bore only on the Waco & Northwestern Division of the railway company. On November 3, 1891, the Lackawanna Company, in cause No. 227, filed its intervention, which is now before this court. It is substantially the same as the interventions it filed in causes Nos. 185 and 198. Subsequently to the final decree of May 4, 1888, to wit, on April 20, 1889, the Lackawanna Company filed its petition in cause No. 198, praying that the receivership therein should continue over the property then in the possession of the court, until its claims should have been finally decreed and paid. On this petition an order was made ordering the receiver to retain possession of the property until the further order of the court. It was also ordered that the receivership which had theretofore been ordered in cause No. 227 should be concurrent with the receivership in cause No. 198, and that the receiver should keep separate accounts of the earnings and expenses of the Waco & Northwestern Division. On October 21, 1895, Moran Bros. and Henry K. McHarg, holders of bonds secured by the mortgage or deed of trust which is the subject of cause No. 227, intervened in that cause pro interesse suo.

The intervention of the Lackawanna Company in cause No. 227, which is now before this court, alleges that on December 28, 1882, on April 26, 1883, and on October 30, 1883, under three contracts respectively bearing said dates, it agreed to furnish to the Houston & Texas Central Railway Company about 20,000 tons of steel rails at prices stated in the contracts, and that upon the delivery of each 560 tons of rails payments were to be made in cash or in notes of the railway company, payable in six months from the average date of delivery of the rails, with interest at 6 per cent., with the privilege of renewing the notes before maturity for a further term of six months, by giving new

notes and paying interest for the additional six months at 6 per cent. The intervener alleges that it delivered 5,009 tons of rails under the second contract, of date April 26, 1883, for which it received the promissory notes of the railway company; and that, under the third contract, of date October 30, 1883, it delivered about 8,552 tons of rails, for which it also received promissory notes of the railway company. The balances now claimed are $6,426.51 for rails claimed to have been used on the Waco & Northwestern Division under the second contract, and $99,300.64 for rails claimed to have been used on the same division under the third contract. Intervener alleges that the rails which it furnished were employed for the useful improvements and necessary repairs of the main line of the railway company and of its Western Division; that the rails were so absolutely necessary to the railway company to replace the old iron with which its tracks were laid that it is doubtful whether the railway company could have maintained its existence without them, and that prior to the improvement of the railway by means of the rails accidents to life and limb and damage to property were so great, owing to the condition of the tracks of said company, that the name of the Houston & Texas Central Railway Company became a terror to the traveling and shipping public, and a by-word and a reproach. The intervener further alleges that by means of the rails furnished by it the railway has been kept in safe running order, the business increased, and the railway rendered more valuable to the bondholders. It is also alleged that the indebtedness was contracted in consideration of the promise of the railway company to pay the same out of its earnings, and that intervener made the contracts under the expectation and belief that its claim would be paid out of the earnings, by preference over the bondholders. The intervener further alleges: "That it is provided by the various deeds of trust securing the mortgage bonds upon the various portions of the railway of the railway company that the trustees of such mortgages, if they acquire possession of said railway under said mortgages, shall pay any floating debt or debts of said company out of the gross earnings of the said railway; and that under and by virtue of said provision your petitioner's claims aforesaid are specially made preferred claims upon the gross earnings of said railway, and enjoy priority over all mortgages bearing upon the same, and are entitled to be paid out of the gross earnings of said railway before said earnings are applied to the payment of any incumbrances whatsoever upon the same; and that your petitioner made the loans hereinabove described relying upon the said clause in the said mortgages, and in the expectation that the said company would comply with the obligation therein recognized by itself and by its mortgage bondholders, and that it would pay your petitioner's said claim before applying any part of its gross earnings to the payment of coupons or other bonded indebtedness. That said company and its bondholders are thus not only by law, but by contract, obligated to apply current earnings to payment of current expenses, and that such claims for current expenses are specially made preferred claims upon the gross earnings of said railway over all claims of bondholders." It is also alleged that the railway company has not only failed to pay, but has used a large amount of the earnings for the payment of coupons on the bonds secured by the mortgage upon which a bill of foreclosure was filed in the cause. Intervener alleges and claims that the revenues of the railway company should be applied to the payment of the claim for rails by preference over all bondholders and coupon holders.

By proper pleadings the Farmers' Loan & Trust Company, complainant in cause No. 227, on December 7, 1891, and Moran Bros. and Henry K. McHarg, interveners, on January 13, 1896, objected to and opposed the allowance of the demand of the Lackawanna Coal & Iron Company as a preferential claim. Moran Bros. and Henry K. McHarg specially pleaded the statute of limitation of two and four years. The matter of the intervention of the Lackawanna Company was referred to a master, who reported adversely to the demand. The master's report was not excepted to. Inter alia, the master reports the following findings: On December 28, 1882, intervener entered into a written contract with the railway company to deliver to it 5,000 tons of steel rails in March, April, and May, 1883, payment to be made in cash on delivery of the rails, or in notes of the purchaser, payable at six months, with 6 per cent. annual interest. Under this contract, 5,020 tons of rails were delivered, in

payment of which the railway company executed its 10 promissory notes to the intervener, payable at six months, amounting, with interest, to $206,932.16; all of which notes were either paid at maturity or at the maturity of other notes given in renewal. On April 26, 1883, another written contract was entered into by the same parties for the delivery of 5,000 tons of rails during August, 1883, or earlier, if called for; payment to be made in cash or in notes of the purchaser payable at six months with 6 per cent. annual interest. This contract provided that the railway company should have the privilege to renew the notes before their maturity for a further term of six months, by paying the interest, 6 per cent., or adding the interest to the new notes. Under this contract, 5,009 tons of rails were delivered during June, August, and September, 1883, and 10 promissory notes, payable at six months from their dates, dated on divers days in June, August, and September, 1883, and aggregating, with interest, $201,346.64, were delivered to intervener. As these notes matured, payment of so much of the debt as was not satisfied at maturity was extended, until in process of such settlement and extension the railway company, in settlement of the balance due under the contract of April 26, 1883, delivered to intervener eight promissory notes, payable at four months from their dates, dated on divers days in September, October, and December, 1884, and aggregating $118,000. During the negotiations between intervener and the railway company, which resulted in the execution of these renewal notes, intervener demanded that the railway company should secure the renewal notes by the hypothecation of collaterals, and in response to such demand the railway company hypothecated with the intervener 170 first mortgage bonds of the Galveston, Harrisburg & San Antonio Railway Company, which, by agreement of counsel, are admitted to be worth $157,250. On October 30, 1883, the same parties entered into another written contract, similar in general terms to the other contracts, and containing the clause securing to the railway company the privilege of renewing the notes and providing for the delivery of 10,000 tons of steel rails between February 1, and August 1, 1884. Under this contract, intervener delivered 8,552 tons of rails during February, March, April, and May, 1884. Through error, eight notes, in payment of rails supplied under this contract, dated on divers days in February and March, 1884, were made payable at 12, instead of 6, months. They were, however, accepted by intervener. Afterwards, in April and May, 1884, the railway company, in settlement of the balance due on the 8,552 tons of rails delivered under the contract of October 30, 1883, delivered to intervener nine promissory notes, payable at six months from their dates, and renewable for a like term, at the maker's option. Each of these notes was renewed for six months. The 17 notes given under this contract were dated on divers days in February, March, October, and November, 1884, and aggregate $327,175.50.

The master's report also contains the following findings: "I find that negotiable promissory notes were given petitioner by the defendant company for all rails sold under the three contracts; that all of said sales were made on a stated credit for a fixed period of time, viz. six months after the average date of each delivery, and that said defendant company had the right, under said contracts, to extend the time six months longer from the maturity of said notes; that such extensions were made for the accommodation and to suit the convenience of said defendant company, and that said extended negotiable notes remaining unpaid matured, as shown above in clauses 2 and 3, during the months of February, March, April, and May, 1885. I find that all the rails delivered under the first contract, and about one-half of the rails delivered under the second contract, were paid for by the railway company prior to the appointment of any receiver of said property; but that the remaining half under the second contract, and all rails furnished under the third contract, are not paid for. I find that the rails furnished under the second contract were furnished under a contract made a year and ten months prior to the appointment of the receiver in cause No. 185, and about three years and three months prior to the appointment of the receiver in consolidated cause No. 198, and about six years prior to the appointment of the receiver in this cause. I find that the rails furnished under the third contract were furnished under a contract made about sixteen months prior to the receivership in cause No. 185, and about two years and nine months prior to the receivership in consolidated

cause No. 198, and about five years and six months prior to the appointment of the receiver in this cause. * * * I find that the debt for which the Lacka-wanna Company claims payment in its petition herein cannot be classed as a current debt made in the ordinary course of business, as those terms seem generally to be understood, yet it appears that at the time when the contracts hereinbefore mentioned were entered into between said Lackawanna Company and the defendant railway company the condition of the track of the defendant railway company was such that the demand for new rails upon the most worn portion of the roadway was practically imperative. For a number of years prior to December, 1882, only about 5,000 tons of new rails had been purchased. The road north from Houston for 90 miles was built in 1857, 1861, and thence northward to Denison, 1867–1872. The Western Division, leading to Austin, was constructed in part prior to 1861, and completed in 1873, and the Waco Division was completed about 1875. The condition of these roads was bad, except such portions as had been relaid with 5,000 tons of rails purchased prior to December 28, 1882. There was continual breakage of rails and wrecking of trains; the track was unsafe, and was generally so regarded, not only by 'railroad men,' but by the traveling public; the damage to merchandise, rolling stock, etc., was continuous, and the need for new rails appears to have been 'absolutely necessary as a preservation of human life, the loss of which was liable to occur at any moment.' I find that when the aforesaid contracts were made with the said Lackawanna Company both seller and buyer expected the debts to be paid from the net income of the railway; that the credit extended under said contracts was at the request of and for the accommodation of the defendant railway company, and upon its general credit. That said sales were made without any stipulation that security should be given by the defendant company for said rails, or that payment therefor should be made out of any particular fund, or in any particular way; that said sales were for an unusually large amount of rails, and the defendant was unable to pay cash therefor, and there was no other way of obtaining said rails except upon credit; and petitioner herein, at the time of said contracts and sales, had knowledge of the mortgage of June 16, 1873, given by the defendant railway company upon the properties of its Waco & Northwestern Division to secure the first mortgage bonds, which said mortgage has been herein foreclosed. * * * I find in the mortgage given by the Houston & Texas Central Railway Company to the Farmers' Loan & Trust Company, trustee, dated June 16, 1873, being the same mortgage declared on herein, the following provisions: 'And in case the said Houston & Texas Central Railway Company shall fail to pay the principal, or any part thereof, or any installment of the interest, or any part thereof, or any of the said bonds at any time when the same shall become due and payable according to the tenor thereof, and for sixty days after having been demanded, it shall be competent for the said trustee, its successors or assigns, to enter upon the said railway, and the premises and property herein conveyed, by its attorneys and agents, and take possession of the same without let or hindrance of the said first party, and every part and parcel thereof, and the appurtenances, and appoint an agent to operate and manage the same and receive the revenue and income thereof, applying the said funds, after deducting taxes, necessary expenses, and counsel fees, to keep the same in good order and repair, and the surplus to pay the principal and interest of all the bonds which may be due and outstanding and secured hereby, pro rata, and thereafter to the payment of any contributions due to the sinking fund herein established. And upon the request of the holders of one-fifth in amount of the bonds so in default which may be at any time outstanding under this deed of trust, it shall be the duty of said second party, by its president or agent duly appointed in its behalf, to enter upon and take actual possession with or without entry or foreclosure of said railway and property herein described, and all and singular each and every part and parcel thereof, and assume its management, until the arrears of both principal and interest be paid, or the property sold as herein prescribed, receiving the rents, revenues, and income thereof, and applying them in the same manner as above stated. * * * It is, however, expressly agreed that the said party of the first part may dispose of the current net revenues and income of all the said property and railway hereby conveyed in such manner as it shall deem best, until default shall be made in the

payment of the interest or principal of said bonds, or of any one or more of them, and shall have the right to sell and dispose of any of such real estate or other property as it may own or acquire, which may not be needed or required for the purposes and business of the said Waco & Northwestern Division, except in the case of the six thousand acres per mile of completed road, and which sale and conveyance of such outside property shall transfer the said property and title free from incumbrance of this mortgage or deed of trust, and to change its tracks, and make any and all alterations necessary for the benefit of the same.' I find that there is no provision in said mortgage that the trustee may, if it acquired possession of said railway under said mortgage, pay any floating debt or debts of said company out of the gross earnings of said railway."

The lower court confirmed the master's report, and dismissed the intervention. The Lackawanna Company has appealed.

E. B. Kruttschnitt, for appellant.

L. W. Campbell, for appellees Moran Bros. and Henry K. McHarg.

Before TOULMIN, MAXEY, and PARLANGE, District Judges.

PARLANGE, District Judge (after stating the facts as above). It is contended on behalf of the Lackawanna Iron & Coal Company that its claim is a preferential one, within the doctrine of Fosdick v. Schall, 99 U. S. 235, and other cases in which certain claims were accorded preference over the holders of railroad mortgage bonds. The intervener's counsel urge that the case of Burnham v. Bowen, 111 U. S. 777, 4 Sup. Ct. 675, is analogous in principle to the present case. The urgent need of the railway company for the rails supplied by the intervener; the dilapidated condition of the road prior to the supplying of the rails; the danger to life, limb, and property which resulted from such condition; the increased business of the road and the augmented value of the bondholders' security,—are asserted and are pressed upon the court's attention, as considerations for declaring the intervener's claim preferential. Even if all these assertions were sustained by the findings,—and some of them do not appear to be so sustained,—the intervener's claim to a preference would, in our judgment, have to be rejected. We do not understand that the doctrine enunciated in Fosdick v. Schall, supra, was based merely or mainly upon the urgency of the need of the railway for the labor, supplies, or equipment to which a preference is accorded. Nor do we apprehend that the mere fact that the supplies, labor, or equipment furnished, may have augmented the value of the bondholders' security, gives rise to a preference. In the light of Fosdick v. Schall, supra, and the other cases in which the supreme court and other courts have followed the main case, our understanding of the doctrine is that within narrow limits, a court of equity, having in its custody a railroad which is being foreclosed by its mortgage creditors, may make preferential payments of such claims as debts due to operatives, limited amounts due to connecting roads for unpaid freight and ticket balances, and limited amounts due for supplies needed from day to day, or from month to month, in the ordinary course of the railroad's operations. The controlling principle appears to be that a railroad, having public duties to discharge, must be kept a going concern while in the hands of the court, and that to that end debts due its employés and other current debts incurred for its ordinary operations, which it is not usually practicable to pay in cash,

and which are therefore payable on short terms, should be paid as they would have been paid if the court had not taken away from the corporation the control of the railroad. A cessation of the railroad's operations by failure to pay promptly the operatives or such other debts as railroads must necessarily incur for their ordinary, current operations, must be prevented. The preferential payment of debts, restricted to the narrow limits indicated, operates no impairment of the bondholders' rights, for it is made both in the interest of the property and of the public. One purpose is to preserve the property in such condition that it may be sold as a going concern, and thus may suffer no diminution of value while in the hands of the court. This is to the direct benefit of all creditors. The other purpose is to enable the railroad to continue the performance of its public duties. Of this the creditors will not be heard to complain, because they are charged with knowledge of the public obligations of their debtor.

In Finance Co. of Pennsylvania v. Charleston, C. & C. R. Co., 10 C. C. A. 323, 62 Fed. 205, the circuit court of appeals for the Fourth circuit, through Mr. Chief Justice Fuller, after stating certain debts which may be paid by preference, says: "Of course, the discretion to enter such orders should be exercised with great care." The chief justice then refers to the case of Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824, as indicating the narrow limits within which a court of equity should confine itself in making preferential payments over railroad mortgagees.

In Thomas v. Car Co., just cited, the supreme court quoted approvingly from Kneeland v. Trust Co., 136 U. S. 89, 10 Sup. Ct. 950, where it was said:

"The appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested contract liens. Because, in a few specified and limited cases, this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver acquires power to give such preference to any general and unsecured claims. It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness, in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. So, when a court appoints a receiver of railroad property, it has no right to make that receivership conditional on the payment of other than those few unsecured claims which, by the rulings of this court, have been declared to have an equitable priority. No one is bound to sell to a railroad company, or to work for it; and whoever has dealings with a company when property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage liens. It is the exception, and not the rule, that such priority of liens can be displaced."

In Thomas v. Car Co., supra, the supreme court proceeded to say:

"The case of a corporation for the manufacture and sale of cars dealing with a railroad company whose road is subject to a mortgage securing outstanding bonds is very different from that of workmen and employés, or of those who

furnish, from day to day, supplies necessary for the maintenance of the railroad. Such a company must be regarded as contracting upon the responsibility of the railroad company, and not in reliance upon the interposition of a court of equity."

In Kneeland v. Trust Co., supra, it is said:

"It is the exception, and not the rule, that such priority of liens can be displaced. We emphasize this fact of the sacredness of contract liens for the reason that there seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens."

In Bound v. Railway Co., 7 C. C. A. 322, 58 Fed. 473, the circuit court of appeals for the Fourth circuit, Mr. Chief Justice Fuller sitting as a member of the court, in a case almost identical with the present case, said:

"The supreme court has recently in Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824, indicated the narrow limits to which an equity court should confine itself in allowing any unsecured claim to displace vested contract liens. Wages due employés, current operating expenses, current balances of ticket and freight money arising from indispensable business relations, and similar current debts accruing within 90 days, are recognized as among the limited class of claims which, in its discretion, the court may allow to have priority. In the case cited, the supreme court held it error to allow a claim for the rental of cars necessary to operate the road for the six months prior to the receivership."

Bound v. Railway Co., supra, has been cited by the circuit court of appeals for the Fourth circuit in Finance Co. of Pennsylvania v. Charleston, C. & C. R. Co., 10 C. C. A. 326, 62 Fed. 208; by Circuit Judge Simonton in Central Trust Co. of New York v. Charlotte, C. & A. R. Co., 65 Fed. 269; and by Circuit Judge Colt in Wood v. Railroad Co., 70 Fed. 743.

It would subserve no useful purpose to cite more extensively from the numerous authorities which show the narrow and restricted limits within which, in cases such as the matter in hand, preferential payments can be made. No case has been cited, nor has any come under our observation, in which such a claim as that of the Lackawanna Company has been, on final adjudication, allowed a preference.

The case of Burnham v. Bowen, supra, relied on by the intervener's counsel, and claimed to be analogous in principle to the instant case, was based on a demand for coal used in running the locomotives. The coal was supplied to the railroad company a few months before the appointment of the receiver, and the claim was found by the supreme court to be "one of the current debts for operating expenses, made in the ordinary course of continuing business." We discover no similarity of principle between that case and the case at bar. Coal is an article of constant and uninterrupted consumption on a railroad, and its purchase at short intervals, for the purpose of running the locomotives, in quantities not exceeding the operating requirements of the road, is clearly a current expense of the road. But it is difficult to see how the purchase of 20,000 tons of rails, made under the circumstances stated in the intervener's own pleadings, can be a current debt "for operating expenses made in the ordinary course of continuing business." If the road was in the condition of dilapida-

tion which is inferable from the intervener's averments, it might be sufficient to say, in denying the demand, that the rails were supplied, not as a matter arising in the ordinary course of the railroad's operations, but for the virtual reconstruction of the road.   No authorities need be cited to establish the proposition that works of reconstruction are not entitled to preferential payment.   That the necessity for the supplies does not entitle to preferential payment, unless the supplies are for current expenses in the ordinary course of operation, is forcibly shown by the case of Morgan's L. & T. R. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 11 Sup. Ct. 61, in which it was substantially held that the mere fact that money was loaned to a railroad company to pay the interest on its first mortgage bonds does not entitle the lender to preference; and that, although advances of money may have enabled a railway company to maintain itself, that fact alone does not entitle the lender to priority

The contention that the intervener is entitled to preference because the rails supplied by it must have enhanced the value of the bondholders' security is clearly untenable.   In Railway Co. v. Cowdrey, 11 Wall. 482, Mr. Justice Bradley, as the organ of the court, said:

"As to the point of giving priority to the last creditor for aiding to conserve the thing, all that is necessary to say is that the rule referred to has never been introduced into our laws except in maritime cases, which stand on a particular reason."

Also, see Thompson v. Railroad Co., 132 U. S. 68, 10 Sup. Ct. 29; Jones, Corp. Bonds, § 584; Fogg v. Blair, 133 U. S. 534, 10 Sup. Ct. 338; Railroad Co. v. Hamilton, 134 U. S. 296, 10 Sup. Ct. 546.

The unusually large purchase of rails; the time within which they were to be delivered; the condition of the road; the contracts providing for notes at six months, renewable for a like term, at the maker's option; the hypothecation of securities for the payment of the claim; the knowledge which the intervener had of the mortgage; the fact that the contracts contained no promise to pay out of any particular fund; the time which elapsed between the date of the contracts and the appointment of a receiver in cause No. 185,—are circumstances which, taken together, cannot fail to convince us that the intervener relied upon the general credit of the railway company.

We see no error in the action of the circuit court in dismissing the petition of intervener, and the decree appealed from is therefore affirmed.