FIRST NAT. BANK OF HOUSTON v. EWING et al. (No. 911). SMITH v.
HOUSE et al. (No. 912). GALVESTON, H. & N. RY. CO. v. SAME (No.
900). ST. CHARLES CAR CO. v. SAME (No. 901). CORBETT v. SAME
(No. 902).

(Circuit Court of Appeals, Fifth Circuit. May 30, 1900.)

1. RAILROADS—FORECLOSURE OF LIENS—EFFECT OF DECREE.
    A holder of railroad bonds, who becomes a party by intervention to a
suit against the company in which receivers have previously been ap-
pointed, and by authority of the court have issued receivers' certificates,
is concluded by a subsequent decree which adjudges the validity of such
certificates as liens; and unless he takes steps to review such decree, by
petition for rehearing or appeal, he cannot contest the question on dis-
tribution of the proceeds of the property after sale.

2. SAME—RECEIVERS' CERTIFICATES—PREFERENTIAL LIENS.
    Where a railroad was uncompleted at the time it passed into the hands
of receivers on the insolvency of the company, and only partially equip-
ped,—lacking terminal connections, bridges, right of way, and rolling
stock, as well as ballasting and other materials necessary for its comple-
tion, maintenance, and safe operation,—it was proper for the court to au-
thorize the issuance and sale of receivers' certificates to raise money for
its completion and further equipment, as well as to pay debts due for
labor and operating expenses previously incurred, and to make such cer-
tificates, as well as the ordinary and proper expenses of the receivers in
operating the road, in excess of its earnings, liens on the property supe-
rior to those of prior mortgages.

3. SAME—MECHANICS' LIENS—LACHES IN ASSERTING.
    A contractor doing work and furnishing material for the construction of
a railroad, if entitled to a mechanic's lien therefor, must, to preserve and
enforce such right, comply with the statutory requirements as to filing
and recording the contract or claim; and he is not relieved of such duty
by the fact that he files his claim in a court of equity, which has taken
possession of the property by its receivers, and that such claim is allowed
as a valid indebtedness of the company; and, even if the court has power
to relieve him from a compliance with the statute, it will not do so
where no right to a statutory lien is asserted until after four years of
litigation.

4. SAME—PRIORITY OF LIENS—INDEBTEDNESS FOR ORIGINAL CONSTRUCTION.
    Indebtedness incurred by a railroad company to a contractor for labor
and materials furnished in the work of original construction of its road
prior to the time when the property passed into the hands of receivers
is not entitled to priority of lien in equity over prior mortgages, or over
indebtedness incurred by the receivers for operating expenses.

5. SAME—ESTOPPEL.
    A contractor, who at the time a railroad passed into the hands of re-
ceivers held a claim against the company for original construction work,
and who afterwards, under contracts with the receivers, completed the
work of construction, receiving in payment' receivers' certificates issued
under a decretal order of the court making them first liens on the prop-
erty, cannot, after disposing of such certificates to others, attack their
validity or right of priority in behalf of his original claim, and especially
where during the course of the litigation he had maintained such validity
and priority.

6. SAME—RIGHTS OF PURCHASER AT FORECLOSURE SALE—ACCRUED TAXES.
    A decree directing the sale of railroad property in a foreclosure suit,
subject only to certain enumerated liens, which do not include taxes, and
free from the liens asserted by any of the parties to the suit, and an or-
der directing its conveyance pursuant to such sale, free "from all claims
arising during said receivership or prior thereto," by implication exclude
the taxes accruing during and prior to the receivership from the claims

subject to which the property is sold; and the purchaser is entitled to insist upon the payment of such taxes from the earnings of the receivership, or, in default of earnings, from the proceeds of the sale. Maxey, District Judge, dissenting.

**7. SAME—PREFERRED CLAIMS—TAXES.**

Taxes accruing against the property of an insolvent railroad company constitute a preferred claim, and are entitled to be paid in full, including interest, penalties, and costs, before any other claims, except the judicial costs.

**8 SAME—RIGHTS OF PURCHASER AT FORECLOSURE SALE—CLAIMS FOR RIGHT OF WAY.**

A purchaser of railroad property at foreclosure sale takes the same subject to such defects of title as exist in reference to land occupied as right of way, in the absence of a provision to the contrary in the decree, and cannot insist that claims for right of way used by the mortgagor company, but not paid for, shall be paid from the proceeds of the sale.

**9. SAME—INDEBTEDNESS INCURRED BY RECEIVERS—PURCHASE OF ROLLING STOCK.**

Railroad receivers purchased certain rolling stock under authority from the court, paying in part for the same, and executing a contract by which a lien was reserved to the seller for the unpaid purchase money. On default the seller demanded possession of the property under the contract, which was refused; and the receivers continued to use the same for over three years, when the court entered a decree directing its sale for the payment of the lien, and adjudging the deficiency remaining unpaid, if any, to be a valid indebtedness of the receivers, incurred in the operation of the road. *Held,* that such adjudication was conclusive upon all parties to the litigation, and, in the absence of an appeal therefrom, entitled the seller to payment of the deficiency remaining due after sale of the property on the same basis as other claims against the receivers for operating expenses.

**10. SAME—PRIORITY OF CLAIMS AGAINST FEDERAL RECEIVERS—LAW GOVERNING.**

The classification and right to priority of payment of claims of employés in the immediate service of railroad receivers appointed by a court of the United States are matters for the determination of that court in accordance with the general principles of equity, unaffected by state laws regulating claims of employés and the distribution of funds in the hands of receivers of a state court.

**11. SAME.**

Act Aug. 13, 1888, § 2 (25 Stat. 436), requiring receivers of federal courts to manage and operate the property in their possession in accordance with the requirements of the laws of the state in which it is situated, and making their willful violation of such requirement a criminal offense, was not designed to interfere with the constitutional jurisdiction of the courts of the United States in matters of equitable cognizance, and does not require them to administer property in their hands in accordance with state laws.

**12. SAME—PRIORITY BETWEEN PREFERRED CLAIMS.**

Except in the matter of taxes, no priority should be given among the debts and claims, whether receivers' certificates or other debts, which are allowed preference over the mortgage bonds of a railroad company, but all should stand alike.

Appeals from the Circuit Court of the United States for the Eastern District of Texas.

These five appeals are from the final decree of distribution made by the trial court in the main suit of Alonzo J. Tullock v. Galveston, Laporte & Houston Railway Company. It appears from the record that the Galveston, Laporte & Houston Railway Company is the successor of the Laporte, Houston & Northern Railroad Company, which was incorporated October 7, 1892, with authority to construct a railroad from the town of Laporte, Harris county, into the city of Houston, the distance being 22 miles. By an amendment of the charter, which became operative on August 10, 1893, the company was authorized to construct

two branch lines,—one from the town of Laporte to a point on the Sabine river, a distance of about 150 miles, and the other from Laporte to and into the city of Galveston, a distance of about 35 miles. By a further amendment, becoming operative February 23, 1895, authority to construct the road was restricted to the 22 miles above mentioned, and the branch line to Galveston, making a continuous line of railroad from Houston to Galveston, a distance of about fifty-seven miles, with such additional lines for terminal purposes at and in the cities of Galveston, Laporte, and Houston, and at such other stations on the main line as terminals might be necessary for the successful operation of such railroad, exclusive of terminals, sidings, and switches; such railroad to be situated wholly within the limits of Galveston and Harris counties. By an act of the legislature passed on January 30, 1895, the name of the old company was changed to that of Galveston, Laporte & Houston Railway Company, and the right was conferred upon it to purchase the property of, or consolidate with, the North Galveston, Houston & Kansas City Railroad Company and the Houston Belt & Magnolia Park Railway Company. The original company, having entered upon the work of construction, executed and delivered, August 1, 1894, to the Union Trust Company of New York, as trustee, a deed of trust upon all its property then owned or to be thereafter acquired, to secure the payment of bonds to be issued for construction purposes. One hundred and fifty bonds, of $1,000 each, aggregating $150,000, were executed by the company and delivered to the trustee; and the same, after having been duly certified and registered, were returned to the railroad company. Of the 150 bonds thus returned, 40 were retained by the company, and the remainder passed to other parties, including 63 claimed by the First National Bank of Houston. On April 1, 1895, the original company, the Galveston, Laporte & Houston Railway Company, executed and delivered to the Continental Trust Company of the city of New York, as trustee, a second mortgage or deed of trust on the property of the company then owned or to be thereafter acquired, to secure an issue of 850 bonds, of $1,000 each. The bonds were delivered to the trustee, and were by it certified, registered, and returned to the company. Of the number returned, 150 were retained by the railroad company, and the remainder were hypothecated with various parties to secure indebtedness of the company. On January 7, 1896, about the time of the appointment of receivers, the track of the Galveston, Laporte & Houston Railway Company "extended from Brady Junction, in Harris county, about four miles south of the city of Houston, to Virginia Point, in Galveston county, a distance of forty-five miles, and from the south or Galveston Island end of the Galveston Bay Bridge to the city of Galveston, a distance of four and one-half miles, with a branch from Laporte Junction to Laporte, three miles, and another branch from Heffron to North Galveston, about three miles and seven-tenths, making a total track of fifty-six and two-tenths miles." As a creditor of the Galveston, Laporte & Houston Railway Company, Alonzo J. Tullock on January 7, 1896, exhibited his bill, by which he sought to have the property of the company placed in the hands of a receiver; and on the same day T. W. House and M. T. Jones were appointed receivers, who were directed to take charge of the property. On January 13, 1896, an application was made by the receivers for authority to issue receivers' certificates to the amount of $250,000. The application having been referred to the master, he made his report on January 22d following. In his report he found that the Galveston Bridge would require for its completion $21,850.81; that other bridges required immediate repairing; that cattle guards should be constructed, and that it was necessary to ballast the road-bed; that rolling stock was needed; that station houses, round houses, repair shops, and other necessary buildings should be erected; that the road should be fenced and terminal facilities acquired, and proper connections should be made with various roads entering the city of Houston; and that the accounts due employés of the company from September 1, 1895, to January 6, 1896, amounted to $14,484.87. Upon the facts found, the master recommended the issuance of receivers' certificates to an amount not exceeding $300,000, "for the purpose of completing, operating, and preserving the property."

On January 23, 1896, the court made the following order, authorizing the receivers to issue certificates amounting to $250,000: "On this 23d day of January, 1896, at chambers, came on to be heard the report of Morgan M.

Mann, master in chancery, herein filed on the 22d day of January, 1896, on the petition of T. W. House and M. T. Jones, receivers, filed herein on the 13th day of January, 1896, asking for authority to borrow two hundred and fifty thousand dollars and to issue receivers' certificates therefor; and it appearing to the court that the complainant and defendant and all intervening creditors were present and represented by their attorneys, and no exceptions having been taken by any of them to the report of said master, and all of the said parties having waived exception thereto, it is therefore considered by the court, and so ordered, adjudged, and decreed, that the master's report be, and the same is hereby, approved and confirmed. It is further ordered, adjudged, and decreed by the court that T. W. House and M. T. Jones, receivers herein, be, and they are hereby, authorized to borrow the sum of two hundred and fifty thousand dollars, for which sum said receivers are empowered to issue receivers' certificates or debentures in such amounts as they may deem proper, not to exceed said sum of two hundred and fifty thousand dollars; said certificates or debentures to fall due on or before three years from and after their respective dates, and to bear interest at a rate not to exceed eight per cent. per annum from date until paid, the interest to be payable at such times as the said receivers shall think best, and to be stated on the face of said certificates. The receivers are further directed to sell said certificates or debentures at a sum not less than par, and to apply the proceeds of the sale thereof to the completion of said Galveston, Laporte & Houston Railway, and ballasting the track of the same; to the purchase of additional rolling stock, ties, lumber, bridges, and any other materials necessary for the completion and the proper maintenance and safe operation of said road; to the construction and repair of such bridges, culverts, depots, and any other structures that the necessities of the road or its traffic, in their judgment, may require; to the purchase, by condemnation or otherwise, of right of way where needed; to the payment of all taxes upon property in the receiver's possession; to the payment of the amount due as shown by the pay rolls of said company from September 1, 1895, to January 6, 1896, amounting to fourteen thousand four hundred and eighty-four $87/100$ dollars; to the payment of the sum of four thousand eight hundred and seventy-nine $12/100$ dollars due the Rogers Locomotive Company, with interest thereon from December 11, 1895, until paid, at the rate of six per cent. per annum; to the payment of operating expenses and such other purposes as the court has heretofore or may hereafter direct: provided that, if said receivers have to purchase said rolling stock with certificates or their proceeds, they shall be limited in the purchase of box cars to ten in number. It is further ordered that said certificates or debentures, when issued, shall become, and they are hereby declared to be, a first lien upon the roadbed, rolling stock, depots, and all other property of said railway company of every character and description, wherever situated, including net earnings after deducting the expenses of this receivership and the operation of the road; said lien to be prior and superior to all other liens upon said property, of whatsoever nature." In obedience to the order, certificates were issued and disposed of to the amount of $245,279.54.

On the 27th day of March, 1897, L. J. Smith, who had previously intervened in the suit pro interesse suo, exhibited a bill, in the nature of an original bill, making defendants Alonzo J. Tullock, Galveston, Laporte & Houston Railway Company, Union Trust Company of New York, trustee, Continental Trust Company of the City of New York, trustee, and others not necessary to be named. This bill was filed by Smith, as the owner of certain liquidating certificates and receivers' certificates issued to him, on behalf of himself and others similarly situated; and prayed, among other things, for the condemnation and sale of the railway property as a trust fund for equitable administration and distribution. On July 31, 1897, the Union Trust Company of New York filed its cross bill, seeking foreclosure in the usual manner, and making Smith and its co-defendants in Smith's bill parties defendant. The Continental Trust Company of the City of New York also filed its cross bill, seeking foreclosure in the usual manner of the trust deed executed to it, and making parties defendant the defendants named in the cross bill of the Union Trust Company of New York, and also the First National Bank of Houston, and others not necessary to be mentioned. Several of the parties (not, however, including

Smith, the two trust companies, and First National Bank of Houston) were dismissed from the suit. On February 25, 1898, a decree was passed adjudging amounts to be due various parties, ordering a sale of the property, and extending the receivership to the bill filed by Smith and the cross bills exhibited by the two trust companies. In reference to the receivership certificates the decree contained the following finding: "(14) That, to wit, on the 23d day of January, 1896, this court, by an order entered after reference to and report of special master herein, authorized said receivers to borrow the sum of two hundred and fifty thousand dollars ($250,000), and therefor to issue receivers' certificates or debentures (hereinafter called 'receivers' certificates') in such amounts as they might deem proper, to fall due on or before three years from and after their respective dates, and to bear interest at a rate not to exceed eight per cent. per annum from date until paid,—the interest to be payable at such times as said receivers should think best, and to be stated on the face thereof, and such certificates to be sold for a sum not less than par, and the proceeds thereof to be applied to certain enumerated purposes; and such certificates were, by said order declared to be a first lien, prior and superior to all other liens, of whatsoever nature, upon the roadbed, rolling stock, depots, and all other property of said railway company, of every character and description, wherever situated, including net earnings, after deducting the expenses of the receivership herein and the operation of the road. (15) That said receivers have, pursuant to and by virtue of said authorizing order of, to wit, January 23, 1896, issued, negotiated, sold, and disposed of receivers' certificates of sundry dates, in the aggregate of the principal sum of two hundred forty-five thousand fifty-three dollars and twenty-five cents ($245,053.25), which certificates recited said authorizing order, and declared upon their face, pursuant to the terms of such order, that they were a first lien, paramount and superior to all other liens, upon the property mentioned in said order, of whatsoever nature; and said certificates are now held by divers and numerous persons, and are unpaid in whole or in part, either principal or interest."

It was declared by the court, in a subsequent clause of the decree, that the receivers' certificates issued and disposed of under the order of January 23, 1896, were, "for the full amount of principal and interest thereof, a valid and subsisting lien upon the railroad, rolling stock, depots, and all other property of said railway company, of every character and description, wherever situated." And the master was directed by the decree to compute and ascertain the amount of interest accrued and unpaid on the receivers' certificates, so far as they had been issued and disposed of. Touching the title to be acquired by the purchaser of the property and the distribution of the proceeds of its sale, the decree contained the following provisions: "(2) It is further ordered, adjudged, and decreed by the court that the purchaser or purchasers of the property herein and hereby ordered to be sold shall, after the delivery of the same to them, hold, possess, and enjoy the said premises and property, and all the rights, privileges, immunities, and franchises appertaining thereto, as fully and completely as the said Galveston, Laporte & Houston Railway Company, the defendant herein, now holds or enjoys, or at the time of the making of the aforesaid mortgage deeds of trust, or at any time before or since then, held or enjoyed, or is or was entitled to hold or enjoy, the same, subject only to the liens, in respect to the portions of property enumerated, to the burden of which such sales were specially herein directed to be made; and all persons who are parties to this cause, or quasi parties, by intervening petitions or otherwise, and all persons claiming under said railway company since the execution of the aforesaid mortgage deeds of trust, are hereby forever barred and foreclosed of all right, title, interest, estate, claim, demand, or equity of redemption of, in, or to any of the property herein directed to be sold, when sold, except as herein otherwise specially provided; and all liens, mortgages, equitable charges, claims, or demands of every nature and description held, owned, or asserted herein by any of such parties or quasi parties to this cause shall be transferred to the proceeds of the sale herein directed to be made, with like but no greater effect than the same appertained to the property itself, and subject to future determination by the court, except as herein otherwise specially provided. (3) And it is further ordered, adjudged, and decreed, that the entire fund to arise from the sale of the property herein directed to be sold

shall be applied as follows: First. To the payment of the costs of this cause, and of all proper expenses attendant upon said sale or sales, including the compensation of the master commissioner making the same; and to the payment of all proper charges, compensations, allowances, and disbursements of the receivers herein, and their counsel and solicitors, respectively; and to the payment of such other proper allowances, compensation, and disbursements to parties or their counsel as may be directed to be paid by the order of this court,—all of such payments to be fixed and allowed by this court or a judge thereof. Second. The remainder of said fund shall be paid into the registry of this court to the credit of this cause, subject to the further directions of this court; and the court hereby reserves all questions as to the classification, rank, and priority of all liens, equitable charges, or other demands, except as herein adjudicated, held, owned, or claimed by any of the parties or quasi parties to this cause, as well as all questions relating to the distribution of such fund among such parties, as well as all questions of marshaling securities, as germane to the matter of distribution; and, to the end of adjusting all such matters on further hearing, the court retains for such purpose the bills and other pleadings herein."

Under the first advertisement of the property by the master commissioner, there being no bid of the upset price of $500,000 fixed by the court, the sale was postponed. The upset price was removed by order of the court, and the property exposed again for sale. At this sale Holt bid the sum of $400,000, but, upon objection to confirmation by Smith and the Beaumont Lumber Company, the court refused to confirm the sale. Another sale was ordered, and the property was purchased by Smith, as the agent of the Galveston, Houston & Northern Railway Company, on October 4, 1898, for the sum of $425,000. Smith's bid was assigned to Charles S. Broadhead, at whose instance the master commissioner, being thereunto duly authorized, conveyed the property to the said Galveston, Houston & Northern Railway Company. On November 18, 1899, the date of the final decree of distribution, there remained of the proceeds arising from the sale in the registry of the court, to be distributed among the various claimants, the sum of $380,160.46. The claims entitled to be paid out of the fund in court were designated as class A and class B. The former, which consisted of court costs, fees of attorneys, master and master commissioner's fees, traffic balances accruing during the receivership, and two right of way claims, were given priority and directed to be paid in full. Class B embraced receivers' certificates, labor claims, amounts due for rolling stock, claims arising out of judgments, claims for live stock killed, and "audited vouchers for debts accruing during the receivership and against the receivership." The remainder of the fund, after paying the claims of class A, being insufficient to pay in full the claims of class B, the decree directed that they should share equally and be paid pro rata. The decree expressly disallowed interest on any of the claims of class B, and it was admitted by counsel on the argument that the claimants in that class would receive only about 77½ per centum of the principal of their indebtedness. The following approximately correct statement shows the aggregate of claims represented by class A and class B, and the amount in the registry of the court:

| | |
|---|---|
| Fund in court.............................................. | $380,160 46 |
| Claims in class A....................................... | 49,000 00 |
| | |
| Amount applicable to class B........................... | 331,160 46 |
| Claims in class B ...................................... | 421,000 00 |
| | |
| Excess of claims over fund............................ | $ 89,839 54 |

The receivers' certificates bore interest at the rate of 8 per cent. per annum from the date of issuance. They were all issued, except one for $226.29, prior to June 8, 1897. If interest be added for only two years, it would amount, approximately, to ....................................... 40,000 00

| | |
|---|---|
| Total excess of claims over fund....................... | $129,839 54 |

The above figures, while not strictly accurate, are sufficiently so for our purpose.

In the various reports of the receivers, beginning October 19, 1896, and ending October 14, 1899, the receivers' certificates were reported, as they were issued, as a liability against the property. The holders of the outstanding first and second mortgage bonds and Smith were adjudged to have liens upon the property of the railway company, but subordinate and subject to the liens of the claimants named in class A and class B. And it was further adjudged that, owing to the insufficiency of funds to discharge the claims of those two classes, no provision could be made for the payment of the demands held by Smith and the bondholders.

The foregoing statement applies generally to the five appeals. Reference will now be made to such parts of the record as are deemed applicable to each appeal separately considered:

### (1) First National Bank of Houston v. Presley K. Ewing et al.

The appellant on May 17, 1897, as the holder of 63 bonds, of $1,000 each, issued by the Laporte, Houston & Northern Railway Company, intervened in the suit pro interesse suo, seeking to establish its claim as a first lien on the property of the railway company. The petition prayed for an order directing the payment of the claim out of the proceeds of the sale of the property, in preference to all other claims not entitled to priority over its claim. The 63 bonds had been deposited with the appellant by J. Waldo on January 31, 1895, as collateral to secure the payment of a debt due by Waldo to it of $25,000. On November 3, 1897, the bonds, under the power conferred by the hypothecation clause of the note, were sold at auction, and bought by the appellant. On November 17, 1899, an order was passed that the appellant should be entitled to receive, out of any moneys applicable to the payment of bonds issued by the Laporte, Houston & Northern Railway Company, only so much money as would equal, pay off, and discharge the sum of $25,000, with interest at 8 per cent. per annum from August 31, 1895. Referring to the 150 bonds issued under the mortgage by the railway company to the Union Trust Company of New York, the decree contained the following provision touching those held by the appellant: "That 63 of said bonds are held by the First National Bank of Houston, upon which said bank is entitled, in pursuance of the decree of court entered on intervention No. 50 on the 17th day of November, 1899, to the sum of $25,000, with interest thereon at the rate of 8 per centum per annum from August 1, 1895, out of any amount which may accrue upon said bonds." And it was further ordered: "That the said bonds were a lien upon the property in the hands of the receivers, subject only to a lien and right of priority of payment of the claims adjudged in the preceding paragraphs of this decree; but the said property having been sold, and there being no funds or proceeds thereof in the registry of the court applicable to the payment of said bonds, or the payment of any part thereof, no provision is made herein for their payment, or any part thereof." From this decree the appellant has appealed to this court.

### (2) L. J. Smith v. T. W. House et al.

This appellant intervened in the original suit on January 22, 1896. As a contractor, he constructed a large part of the railway, and claimed to have furnished material which had been used in its construction. He stated the amount due him to be $61,241.21, with interest, and asserted an equitable lien to secure its payment. He also sought to have receivers' certificates issued for the amount due. On January 27th following, he presented the following application, asking for an order authorizing the issuance to him of conditional certificates to the amount of indebtedness due him: "And he now represents and states to this honorable court: That it is conceded and admitted by the railway company, and all other persons that are now parties to the record, that the sum above stated is actually due to your applicant. That your applicant has received very little money upon work done by him for said company, and has had to secure for himself certain financial backing and credit in order to complete said contract and do said work for the railway company; and, while he does not desire this court at this time to pass upon the question of his preferential rights or priorities against any person, yet, inasmuch as it will be a long space of time before such last-mentioned rights

can and will be determined by the court, and your applicant will be seriously embarrassed, for the reason that his claim against said company is yet in the nature only of an open account, he therefore prays this honorable court, the receivers and all other interested parties being willing, that an order may be made upon the receivers to issue to this applicant receivers' certificates, to be known as 'conditional certificates,' which shall simply certify that there is due your applicant the sum above stated, by the said railway company, subject, however, to the subsequent order and judgment of the court as to the question of preferential rights, priorities, classification for payment, or deduction, as the case may be, for the want of sufficient pro rata funds, and subject to be affected by any order the court may hereafter make pertaining to the effect and force of said certificates, so that said certificates may be practically nothing more than an acknowledgment that the amount of your applicant's claim has been liquidated as to amount, and so that your applicant may be able to use said certificates in the market or elsewhere in a financial way; said certificates to bear upon their face, and have inserted in them and each and all of them, the substance of the above-mentioned qualifications. And he prays that said certificates, to the extent of the said total sum due your applicant, may be issued in denominations of one thousand dollars each, except one for the odd number of dollars to be issued for such amount as even thousand dollars denomination leaves over, and that said certificates be payable on or before three years from their dates, with interest at the rate of six per cent.; that being the interest rate that your applicant's account now draws."

On the same day the application was favorably considered, and the order authorizing the issuance of certificates to the appellant provided as follows: "And whereas, the United States circuit court did on the 23d day of January, 1896, make an order permitting and directing the undersigned receivers to issue certificates to said L. J. Smith for said sum, divided into sixty-one certificates of one thousand dollars each, and one for two hundred and forty-one dollars and twenty-one cents, which certificates were to be issued upon the condition, to be inserted in the body thereof, that the certificates so issued should be taken and accepted as an evidence of the fact that each respective certificate represented an amount actually due and unpaid said L. J. Smith from the railway company, but subject to the preferential rights, priority of payment, and classification thereof as to the payment of the same, and as to the amount or final dividend to be paid thereon from the proceeds of the sale of property, having due regard to the rights of all other creditors as may hereafter be determined, and that the certificates should be conclusive only so far as the amount of the demand of said Smith against the railway company is concerned, and that said certificates should be due and payable on or before three years from their respective dates, and draw six per cent. interest."

The application made by the receivers for the issuance of certificates being before the court, Smith and others on January 27, 1896, executed the following waiver: "Now come the complainant and defendant and all intervening creditors in the above-entitled cause, and waive exceptions to the report of Morgan M. Mann, master in chancery, herein filed on the 22d day of January, 1896, on the petition of T. W. House and M. T. Jones, receivers, filed herein on the 13th day of January, 1896, asking for authority to issue receivers' certificates, and agree that the court may hear and act upon said report at once, and make its decree relative thereto."

After the appointment of receivers the appellant made a contract with them to ballast the roadbed, and on January 27th he presented an application praying for confirmation of the same. An order was duly entered confirming the contract, and the receivers were directed (employing the language of the order) to issue and deliver to the appellant certificates "out of and from the general issue of receivers' certificates heretofore ordered by this court in payment of the amount due him upon shell ballasting up to the time the receivers were appointed, so done under said contract with the railway company, as well, also, receivers' certificates from said general issue for the work to be done, and as done, under the said new contract for the completion of said work with the receivers." On the 12th day of November, 1897, the appellant filed a petition alleging that he was the owner of receivers' certificates of the par value of $4,200, and of other valid claims against the railway com-

pany amounting to $68,000. In this petition he sought a sale of all the property of the company, and prayed that "the proceeds of such sale, after deducting therefrom just allowances for all disbursements and expenses of sale, including reasonable attorney's fees incurred by petitioner in this behalf, be applied to the payment of said certificates and receivership charges, and that the overplus, if any, be apportioned by the court among the creditors and claimants of said defendant railway company as their rights, equities, and priorities may be hereafter determined by the court."

The original decree of February 25, 1898, contained the following finding as to the claim of the appellant: "(11) That at the time of the appointment of the receivers herein said railway company was justly indebted to L. J. Smith, complainant, for labor and material performed and supplied by him in construction work on said railroad, in the sum of sixty-one thousand two hundred and forty-one dollars and twenty-one cents ($61,241.21), which sum of money is due and still unpaid in whole or in part, though frequently demanded. (12) That after the appointment of the receivers herein, to wit, on January 23, 1896, for purpose of judicial ascertainment and liquidation, conditional certificates (hereinafter called 'liquidating certificates') were issued and delivered to said Smith by the receivers herein for the full amount of the indebtedness mentioned in the next preceding paragraph, bearing interest at six per cent. (6%) per annum from the date of their issue, to wit, January 23, 1896, which liquidating certificates were issued pursuant to an order of the court, duly made herein, authorizing their issue, but reserving all questions of rank and priority, etc., in respect thereof."

The Union Trust Company of New York having on February 10, 1898, filed its petition by which it was sought to set aside the previous order of the court authorizing the issuance of receivers' certificates, the appellant on April 16th following answered the petition of the trust company, and, among other averments, he made the following: "This respondent further says that, in reference to the said certificates, the real facts are that when the same were authorized a comparatively small portion of said railroad was uncompleted, in order to the operation of a continuous line, as authorized by said railway company's charter, between said cities of Galveston and Houston; that it then appeared highly advantageous to all parties concerned in interest, in order to the proper management and preservation of said railroad property, that such unfinished portion of said railroad should be speedily completed, and the other expenditures directed by said authorizing order made; that default had already occurred, many months previously, in payment of interest on the mortgage of petitioner, under the provisions of which petitioner had become entitled to take possession of said railroad and operate the same for its benefit, but had failed and neglected so to do; that, in order to the preservation of the charter rights of said railway company, it was highly important and necessary to make said expenditure, to prevent a possible forfeiture of the valuable franchise secured to it, of owning and operating a continuous line of railroad between said cities of Galveston and Houston; that all the funds realized from said receivers' certificates were faithfully expended in and applied to the preservation and management of said railroad property, whereby the good will and integrity of the enterprise were maintained, which was indispensable, and the interests and accommodation of travel and traffic subserved, and the charter rights, franchises, and property of said railway company protected; that all and singular the acts and doings in the premises now complained of were at the time of their occurrence fully known to the mortgage bondholders represented by petitioner, who acquiesced at the time in what was being done, and had ample opportunity to appear and object, had they seen fit to do so, but willfully remained inert and inactive, speculating upon chances, and lying idly by, seeing the receivers and the court dealing with the property in the manner now complained of, without even protesting or disclaiming interest in the receivership; and they now, nevertheless, assert in the cross bill, through the petitioner, that the property acquired by the receivers through such expenditure, which is of great value, is subject to the lien of said mortgage, and they claim, through foreclosure thereof, the proceeds of that property, without paying the debts incurred in its acquisition and necessary preservation, all which acts and doings are contrary to equity and good con-

science, and operate, as this respondent submits, an estoppel upon the petitioner in this behalf."

In an application filed by the appellant on the 8th day of November, 1898, for counsel fees, referring to his answer to the petition of the Union Trust Company of New York, which contested the validity of the receivers' certificates, he alleges that in order to protect the security of said certificates he gave, through his counsel, the matter of priority a careful investigation upon the law and facts, and filed a lengthy response to said contest, involving much labor and research. On October 16, 1899, the master made the following report upon the petition of the Union Trust Company to set aside the receivers' certificates, and the order of court authorizing their issuance: "The undersigned, to whom by the order of March 24, 1899, was referred the matter of the petitions of the Union Trust Company of New York and the Continental Trust Company of New York, attacking the priority of the lien of the receivers' certificates, or other receivers' indebtedness herein, over the mortgage indebtedness represented by them, respectively, begs leave to report: That on January 7, 1896, when the receivers appointed by this honorable court took charge of the properties of the Galveston, Laporte & Houston Railway Company, its track extended from Brady Junction, in Harris county, about four miles south of the city of Houston, to Virginia Point, in Galveston county, a distance of 45 miles, and from the south or Galveston Island end of the Galveston Bay Bridge to the city of Galveston, a distance of 4½ miles, with a branch from Laporte Junction to Laporte, 3 miles, and another branch from Heffron to North Galveston, about 3 7/10 miles, making a total trackage of 56 2/10 miles; that its trains were operated from Virginia Point to the city of Houston, running into Houston from Brady Junction over the tracks of the Magnolia Park Railway Company; that its only railroad connections were at Virginia Point, Texas City Junction, and Houston, making connection at the latter place over the tracks of the Magnolia Park Railroad Company; that the only lines with which it connected were those of the Galveston, Houston & Henderson Railroad Company and the Gulf, Colorado & Santa Fé Railway Company, competitors for business between Galveston and Houston, from whom no through freight could be expected; that the local business along the line of the Galveston, Laporte & Houston Railway Company was so small that it amounted to practically nothing; that the tracks of the Magnolia Park Railway Company were in bad condition; that it had no terminals in Houston, afforded no means of turning trains, and had no yard or place in which to make up trains; that the roadbed of the Galveston, Laporte & Houston Railway Company required ballasting, not only for the proper operation of trains, but to keep it (the ties and steel) from deterioration; that the bridges along its line need repairing, and fences and cattle guards had to be constructed to allow trains to be moved with speed and safety; that the Galveston Bay Bridge was not completed, and completion was necessary to its preservation; that, to compete with the Galveston, Houston & Henderson and Gulf, Colorado & Santa Fé Railway Companies, it was necessary to put the roadbed, bridges, tracks, etc., in proper condition; that, to put the road in a position to get any business whatever, it was necessary to connect with those railroads running into Houston north of Buffalo Bayou, to wit, the Texas & New Orleans, Galveston, Harrisburg & San Antonio, Houston & Texas Central, and Houston East & West, none of which had tracks running from Houston to Galveston, and to connect with the manufacturing industries of Houston, all of which, save one, were situated on the said north side of Buffalo Bayou, to complete the bridge across Galveston Bay, and to connect at Galveston with the tracks of the Galveston Wharf Company; that the Galveston, Laporte & Houston Railway Company, when it went into the hands of the receivers, was practically without rolling stock, owning but 10 flat cars, 5 box cars, 2 passenger coaches, and 1 combination passenger and baggage car, all of which were old and in bad condition; it had two engines, one in fair condition, the other much worn, though the receivers took possession, also, of two Rogers locomotives and tenders, Nos. 3 and 4, the title to which was still in the Rogers Locomotive Company; that on January 13, 1896, the receivers filed in this cause an application for authority to issue receivers' certificates in order to put the railroad in such condition that it could be safely

operated, and could compete for business with the other lines of railroad running from Houston to Galveston; attaching to their application an exhibit setting forth in detail what was needed to effect this, and its approximate cost; that said application came on to be heard before the master on January 20, 1896, and he, after hearing the evidence, reported that the sum of $299,734.34 was necessary to complete, operate, and preserve the property of this railway company, and that this report of the master was confirmed by this honorable court on January 23, 1896; that thereupon the receivers, in accordance with the authority granted them by this honorable court, proceeded to issue their certificates for the purposes set out in their said application; that they issued certificates for the total sum of $245,279.54, of which $75,565.12 were issued for cash; $3,252.98 to L. J. Smith for work on the Galveston Bay Bridge; $50,513.98 to L. J. Smith for ballasting the roadbed; $13,746.39 to pay the employés of the old company, as was provided in the court's order; $8,471.51 to L. J. Smith for general construction work; $29,870 for the Buffalo Bayou Bridge; $14,307.17 for fencing; $2,226.90 to the Galveston & Western Railway Company for rails; $9,934.41 for general bridge work; $13,485.74 to the M. T. Jones Lumber Company for lumber, timber, and ties; $18,491.85 to M. T. Jones and $1,124.55 to T. W. Ford for shell for ballast; and $177.75 for a pile driver. The receivers paid M. T. Jones for 114,163 cubic yards of shell, at the rate of 8¼ cents per cubic yard. They paid T. W. Ford 15 cents a cubic yard for his shell. The difference in price was due to the difference in the quality of the shell, the accessibility of the pit, the amount of labor required to get the material out and load it on the cars, and the general demand for the material. I believe, from the evidence, and I so find, that the prices paid for labor and material, to cover which the above certificates were issued, were just and reasonable, and the best the receivers could get under the circumstances, and particularly in that of having to pay for them in certificates, and not in cash. While the result shows that the road under the receivership was operated at a heavy loss, even after its extension and completion, yet 95 per cent. of the business done by it was derived from those railroads and manufacturing industries on the north side of Buffalo Bayou, in Houston, with which there could have been no connection, and consequently there could have been no opportunity to get business, unless the extension across Buffalo Bayou had been made." To this report the appellant filed exceptions, which, it appears, were not acted upon by the court.

In the final decree of distribution, class A and class B and the bondholders were awarded priority over the claim of the appellant. As to his claim, the decree contained the following clause: "That L. J. Smith is entitled to recover of the defendant the Galveston, La Porte & Houston Railway Company the sum of $61,241.21, with interest thereon at the rate of 6 per cent. per annum from January 23, 1896, subject to the liens and right of priority of payment of all the claims adjudged in the preceding paragraphs hereof, and had a lien upon the property in the hands of the receivers herein; but said property having been sold, and there being no proceeds thereof in the registry of the court applicable to the payment of his said claim, no provision is herein made for the payment of the same, or any part thereof." From the decree thus rendered, Smith has appealed.

(3) Galveston, Houston & Northern Railway Company v. T. W. House et al.

After the assignment by Smith of his bid for the railway property to Broadhead, the latter, on March 29, 1899, by petition, prayed an order of confirmation of the sale, and for the execution by the master commissioner of a deed to him, or as he might direct. The petition contained the further prayer that Broadhead or his assigns might be held, adjudged, and decreed to be the owner of the property conveyed, "free from the claims of all parties and interveners herein," and for all such other and further orders and relief as to the court should seem just and equitable. In obedience to the prayer of the petition, an order was passed authorizing the master commissioner to execute to Broadhead, or to whomsoever he might direct, a deed to the railway property; the concluding paragraph of the order being in the following words: "And it is further ordered that the receivers herein

do, upon the execution of said special master commissioner's deed, deliver upon demand of said Charles S. Broadhead, or to his order or assigns, the said railroad and properties pertaining thereto, and all and singular the properties in his hands as such receiver, and that said Charles S. Broadhead and his assigns shall take, have, hold, possess, and enjoy the same free from all and singular the claims of the parties complainants, defendants, and interveners herein, as and according to the provisions of the decree and orders of the court in this cause, and from all claims arising during said receivership or prior thereto." In compliance with that order, as previously stated, a conveyance was made by the master commissioner to the appellant. On June 1st following, the county attorney of Galveston county filed a petition in intervention on behalf of the state of Texas and Galveston county, praying an order directing the receivers to pay the taxes due the state and county, which was, in the final order of distribution, dismissed without prejudice "to any right they may have, if any they do have, to enforce a lien for their taxes against the property in the hands of the Galveston, Houston & Northern Railway." On June 12, 1899, the appellant filed a petition in which it was sought to have the taxes due the state and the counties of Galveston and Harris, and certain right of way claims, paid out of the proceeds of the sale of the railway property. The petition having been referred to the master, he reported the total amount of taxes due, including principal, interest, penalty, and costs, for the years 1895, 1896, 1897, and 1898, to be $14,009.79. He also reported upon the matter of the right of way, including in his report a list which showed the specific portions of the right of way to which title had not been acquired, and the amounts necessary for its acquisition. Upon consideration of the petition and report of the master, the court ordered the payment of right of way claims to the extent of $1,900, but in other respects denied the relief prayed, in the following language: "Save and except the foregoing provisions of this paragraph, the petition of the Galveston, Houston & Northern Railway Company, asking this court to make provision for the payment of taxes on the property heretofore in the hands of the receiver, and now owned by the Galveston, Houston & Northern Railway Company, and to make provision for the procurement of right of way for the said Galveston, Houston & Northern Railway Company in such cases, where the right of way was not owned by the defendant railway company at the date of the decree of sale, be, and the same is hereby, denied, and the said intervention or petition be, and the same is hereby, dismissed." From the decree dismissing the intervention this appeal has been taken.

### (4) St. Charles Car Company v. T. W. House et al.

Under the order of the court the receivers procured from the appellant certain passenger coaches, and baggage, express, coal, and box cars, for which they executed two notes, bearing date January 24, 1896, for $22,066.66 each, payable respectively in one and two years after date. The notes provided for interest at the rate of 7 per cent. per annum from date until paid, and at the rate of 10 per cent. per annum after maturity. In the original decree of February 25, 1898, it was found that, of the rolling stock belonging to the defendant Galveston, Laporte & Houston Railway Company, the following portion, among others, was subject to purchase-money liens upon contracts of conditional sale, to wit: "Six passenger coaches, three combination coaches, two caboose cars, fifty box cars, and fifty coal cars, purchased by said receivers from St. Charles Car Company, subject to a lien for $44,133.32, as it existed on July 24, 1897, with interest as per contract, accrued and to accrue." The decree ordered the sale of all the property of the railway company, of every nature and description, whether included in the mortgages or not, but the sale was to be made subject to the purchase-money lien held by the appellant on the rolling stock. Smith, the purchaser, declined to take and pay for the rolling stock, subject to which the sale was made, and the appellant presented its petition praying for an order authorizing the master commissioner to sell the rolling stock and apply the proceeds to the payment of its debt. The order made upon the petition, after reciting, among other things, that it was adjudged by the final decree of February 25, 1898, that the receivers of the property and effects of the defendant railway company were justly indebted

to the appellant in the sum of $44,133.32, for the purchase money of the rolling stock already mentioned, directed a sale thereof in payment of the same. A sale was duly made under the order, and the rolling stock was purchased by the appellant at the sum of $30,500. Of this amount, $600 was paid to the master commissioner, as commissions and costs, and the remainder, $29,900, was credited upon the claim of the appellant. Upon the petition of intervention filed by the appellant the master, to whom it was referred, made the following report: "After hearing the evidence, I find as follows: First. That the receivers on January 24, 1896, in conformity with the order of this court, entered into a contract with interveners for the lease and purchase of the cars mentioned in intervener's petition, for the sum of $66,200, of which amount they paid $22,066.66 in cash, and executed their two promissory notes, each for the sum of $22,066.66, due respectively one and two years from date, with interest at 7 per cent. per annum from date, payable semi-annually. These notes bore interest after maturity at the rate of 10 per cent. per annum, and copies of the contract and notes are attached to the intervener's petition. Second. That said two promissory notes were not paid in accordance with the terms of the contract of January 24, 1896. Third. That the intervener, through its attorney, Eleneious Smith, about the 12th day of May, 1897, demanded of these interveners the payment of the money or the return of the cars, as provided in the contract. The receivers were not able to comply with either demand, and retained possession of the cars until the 1st of May, 1899, when they were delivered to John Grant, special master commissioner. Fourth. That the reasonable monthly rental value of said cars was $1,705; making total rental due intervener, if entitled to such, from July 24, 1897, to May 1, 1899, $36,146. Fifth. That it would cost, to put these cars in the condition called for by the contract, the sum of $7,770. Sixth. That by the final decree in this cause the amount due intervener was adjudged to be $44,133.32, with interest at 10 per cent. per annum from July 24, 1897, and that the same was a lien upon said cars. Seventh. That John Grant, special master commissioner, acting under orders of this court, sold on the 23d day of May, 1899, the said cars at public auction, for $30,500, of which amount the sum of $29,900 was entered as a credit upon intervener's claim as of May 24, 1899; leaving balance $22,324.35, with interest at 10 per cent. per annum from May 24, 1899, still due intervener. Testimony offered by the intervener was objected to by the other parties in interest on the ground that, if any rental was due intervener, the same was fixed by the contract at the rate of 10 per cent. interest on the notes, and on the further ground that the so-called lease to the receivers was, under the Texas laws, a chattel mortgage, and, until a foreclosure was had, the receivers were owners and entitled to the use and possession of the same, without liability for rent. It was further objected that on its face the contract shows that the intervener was entitled only to proceeds of sale under a foreclosure, and to have no claim against the receivers under the contract, and were limited in their claims against the receivership to this property, and to their claim for depreciation in value, and for repairs necessary to put them in proper condition for use."

Exceptions filed to the master's report were sustained by the court, and the following order was made, allowing the appellant the sum of $2,868.39: "The court doth further find that intervener is entitled to interest at the rate of ten (10) per cent. per annum upon his debt of $44,133.32 from the 29th day of September, 1898, to the 24th day of May, 1899, making the sum of $2,868.39, and that the same shall be classified and paid as other receivers' obligations, and in all other respects that intervener take nothing by his intervention." From the final decree of distribution allowing $2,868.39 the St. Charles Car Company has appealed.

### (5) W. C. Corbett v. T. W. House et al.

On June 27, 1898, the appellant filed his petition of intervention, in which he claimed to be the owner by assignment of a number of claims against the Galveston, Laporte & Houston Railway Company for work and labor, amounting in the aggregate to $7,334.69. It was alleged that vouchers were given to his assignors in payment of their services as clerks, conductors, brakemen, firemen, switchmen, and day laborers; and the petition prayed that the

amounts due him be declared a lien, prior to all others of a different class, on the properties, franchises, and rights of the railway company. Upon the matters referred to him, the master reported as follows: "The undersigned, to whom, by order of date March 24, 1899, was referred, among other matters, that of ascertaining the undisputed indebtedness of the receivers herein, begs leave to submit a statement of the amounts due employés by the receiver, and setting out in detail: (1) The names of the employés to whom such amounts are still due in person, their occupation, month for which said amounts accrued, and the amounts due for the respective months, aggregating $12,223.13, from which sum there should be deducted $551.90, assigned since the accompanying statement was prepared, to Allen Paul, by H. C. Arnold, Jas. Cahill, L. B. Cummins, W. H. Ford, and J. F. Green; leaving a balance due employés, direct, $11,671.23; (2) the amounts due various parties who hold assignments noted on the receiver's pay roll, showing the name of the assignee, name and occupation of the assignor, number of, order of assignment, month in which services were performed, and amounts due for said months; amounting, with assignments to Allen Paul, noted above, to $35,947." In the detailed statement accompanying the report, it appears that the labor claims assigned to the appellant amounted to $7,334.15.

The decree of distribution allowed the appellant's claim of $7,334.15, and assigned it to class B. It was only entitled, as a constituent of that class, to a pro rata payment of about 77½ per cent. From the decree of the court refusing to allow the claim of the appellant to be paid in full, he has appealed.

No. 900:

Wm. T. Austin and Forster Rose, for appellant.

F. C. Dillard, J. W. Terry, T. W. Ford, and H. O. Head, for appellees.

No. 901:

Walter Gresham, for appellant.

F. C. Dillard, J. W. Terry, T. W. Ford, and H. O. Head, for appellees.

No. 902:

D. F. Rowe, for appellant.

F. C. Dillard, J. W. Terry, T. W. Ford, and H. O. Head, for appellees.

No. 911:

L. B. Moody, for appellant.

J. R. Masterson, F. C. Dillard, J. W. Terry, P. K. Ewing, H. F. Ring, Jas. A. Baker, R. S. Lovett, and Frank Andrews, for appellees.

No. 912:

E. L. Scarritt, J. D. Rouse, and Wm. Grant, for appellant.

F. C. Dillard, S. R. Perryman, J. W. Terry, F. W. Ford, B. K. Ewing, H. F. Ring, Jas. J. Baker, R. S. Lovett, Frank Andrews, and J. C. Hutcheson, for appellees.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

MAXEY, District Judge, after stating the case, delivered the opinion of the court.

The records before us embrace five distinct appeals, and each one will be considered in its order.

(1) First National Bank of Houston v. Ewing et al.

This appeal brings up for review that part of the final decree of distribution which postpones the claim of the appellant as a bond-

holder to the payment of receivers' certificates and other claims classed by the court as preferential. The objection of the appellant to the issuance of receivers' certificates will be first considered. In respect of this item, amounting in the aggregate to $245,279.54, the record shows that the certificates were expressly authorized by an order of court passed January 23, 1896. The statement of the case exhibits the order in its entirety, which discloses clearly the purposes for which the certificates were authorized. By the order it was adjudged that the certificates, when issued, should become a first lien on all the property of the Galveston, La Porte & Houston Railway Company, of every character and description, including net earnings, and that such lien should be prior and superior to all other liens upon the property, of whatsoever nature. While the appellant was not a party to the proceeding which culminated in the order, the record nevertheless shows that its president had full knowledge of the pending receivership, and that he was aware of the application for authority to issue the certificates. On the 17th of May, 1897, as the holder of 63 first mortgage bonds issued by the defendant railway company, and delivered to the Union Trust Company of New York, as trustee, the appellant intervened in the original suit, pro interesse suo, seeking to establish its claim as a first lien on the railway property in preference to all other claims not entitled to priority. Subsequently the Continental Trust Company of the City of New York, as trustee under the second mortgage executed by the defendant railway company, filed a cross bill seeking a foreclosure of its mortgage, and made the appellant and others parties defendant. On February 25, 1898, with the appellant, the two trust companies, and others interested, before the court, a decree of foreclosure was rendered, ordering a sale of the property of the railway company. It was found by the decree that the receivers had been previously, to wit, on January 23, 1896, granted authority to issue interest-bearing certificates not to exceed in amount $250,000, which should operate as a first lien upon the property, including net earnings, prior and superior to all other liens of whatsoever nature, and that pursuant to such authority they had issued, negotiated, sold, and disposed of receivers' certificates of sundry dates in the aggregate of the principal sum of $245,053.25, which were outstanding and held by divers and numerous persons. And upon the findings it was declared "that the receivers' certificates or debentures issued and disposed of under the hereinbefore recited order of January 23, 1896, are, for the full amount of principal and interest thereof, a valid and subsisting lien upon the roadbed, rolling stock, depots, and all other property of said railway company, of every character and description, wherever situated." It was further directed that all liens, mortgages, equitable charges, claims, or demands of every nature and description, held, owned, or asserted by any of the parties to the cause, should be transferred to the proceeds of sale, with like but no greater effect than the same appertained to the property itself, and subject to the future determination of the court, except as otherwise specially directed in the decree. And by the decree were reserved for future determination all questions as to the classification, rank, and priority of all liens, equitable charges, or other demands, except

as therein adjudicated, held, owned, or claimed by any of the parties. It is doubtful whether, under a proper construction of the decree, any question whatever was reserved touching the receivers' certificates, as their status seems to have been adjudicated and their priority established. In any event, all questions as to their issuance, their validity, negotiation, and sale, were effectually set at rest, and they were not thereafter subject to attack, except by an appropriate proceeding to review the decree. If the appellant was dissatisfied with the directions of the decree, he had ample remedies at hand to correct any errors which may have been committed. A petition for rehearing (equity rule 88) was available if seasonably presented, and, as the decree rendered was one from which an appeal would lie, that remedy was open to him. Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 10 Sup. Ct. 736, 34 L. Ed. 97. But the appellant was passive, and failed to contest the validity of the receivers' certificates until the rendition of the final decree of distribution on the 18th of November, 1899. Having had its day in court, it will not now be heard to bring in review questions which were conclusively determined by the decree to which it was a party. Swann v. Wright's Ex'rs, 110 U. S. 590, 4 Sup. Ct. 235, 28 L. Ed. 252; Steamship Co. v. Moran, 33 C. C. A. 313, 91 Fed. 22; Bank v. Hazard (C. C.) 30 Fed. 484. If, however, it be conceded that the classification, rank, and priority of the certificates were left open by the decree of February 25, 1898, there is no doubt that the court was correct in awarding them priority of payment over the first and second mortgage bonds. The certificates, as determined by the last-mentioned decree, were issued, negotiated, and sold pursuant to the decretal order of February 23, 1896. By that order they were directed to be issued for construction and ballasting purposes; for the purchase of rolling stock, ties, lumber, bridges, and other material necessary for the completion, maintenance, and safe operation of the road; for the construction and repair of bridges, culverts, depots, and other structures; for the purchase of right of way and for the payment of taxes; for the payment of the amount due as shown by the pay rolls of the railway from September 1, 1895, to January 6, 1896; for the payment of a debt due to the Rogers Locomotive Company amounting to $4,879.12; and for the payment of operating expenses. It will be readily seen that the certificates were authorized for lawful and proper purposes. So far as they were issued for work to be done and materials to be supplied during the period of the receivership, the authorities are clear that they were entitled to priority over the mortgage bonds, on the theory that the expenditures resulted in the improvement and betterment of the railway property. And it is equally well settled that such priority exists in the case of expenses incurred by the railway company itself, a few months prior to the receivership, for the necessary labor, materials, rolling stock, and other supplies necessary to operate the railway and maintain it as a going concern. Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339; Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Miltenberger v. Railway Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117; Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663; Virginia & A. Coal Co. v. Central Railroad & Banking Co.,

170 U. S. 355, 18 Sup. Ct. 657, 42 L. Ed. 1068; Southern Ry. Co. v. Carnegie Steel Co., 20 Sup. Ct. 347, Adv. S. U. S. 347, 44 L. Ed. ——. The appellant interposed objections to other claims, including audited vouchers amounting to about $120,000. These claims accrued during the receivership for operating and other necessary expenses incurred by the receivers. They are composed of a large number of items, such as rentals of rolling stock, track material, hardware, castings, stationery, ice for trains, coal, purchase of locomotives, terminal extensions, supplies and repairs, track and bridge iron, and rental of freight terminals. In addition, there are a number of claims for stock killed, judgments rendered, advertising, and various other small items of similar character. On the 25th day of September, 1899, the master filed his report upon the audited vouchers as undisputed indebtedness, and, no objection having been taken, the report, under equity rule 83, stood confirmed. It may be also observed that this report of the master was affirmatively acted upon by the court on November 17, 1899, and to the order made no exceptions were filed. The matters of fact contained in the report were thus foreclosed, and the only question left for determination was one of classification of the claims, which by order of the court were assigned to class B. The claims, with possibly a few exceptions, were for necessary expenses incurred by the receivers in the operation of the road, and, under the foregoing authorities, were manifestly entitled to priority over the mortgage bonds. Several of these claims, including an attorney's fee of $5,000 allowed to Ewing and Ring, were strenuously objected to by the appellant. While, in view of the facts appearing of record, the claim for the attorney's fee seems to have been properly allowed, we do not deem it necessary to decide the question, as it is apparent that, if all claims about which there is any doubt be stricken out, the remainder of the claims assigned to class B would be largely in excess of the fund in the registry of the court. Hence, in any view that may be taken of the case, there would be nothing left for the bondholders, and the appellant therefore has no interest in the fund to be protected. The conclusion reached by the circuit court was correct, and the decree is accordingly affirmed.

### (2) L. J. Smith v. T. W. House et al.

The appellant, Smith, intervened in the original suit on January 22, 1896. In his petition, among other allegations, it was alleged that the appellant and the Galveston, Laporte & Houston Railway Company entered into a contract on February 20, 1895, by the terms of which it was agreed that the appellant should do all the clearing, grading, bridging, and track-laying for the railway company necessary to complete the line of railway, including the construction of the bridge over Galveston Bay; the material for the work to be furnished by the railway company, except that the appellant was to furnish all the iron, including bridge iron, bolts, washers, and packers. For the amount due him the appellant sought to establish an equitable lien on the property of the railway company. On January 27th thereafter, the appellant submitted to the court an application alleging that all parties at interest had agreed that the railway company was indebted to

him in the sum of $61,241.22; and he prayed an order authorizing the issuance of receivers' certificates, to be known as "conditional certificates," which should simply certify that there was due the appellant the amount stated, so that the certificates might be practically nothing more than an acknowledgment that the indebtedness had been liquidated as to amount. Agreeably to the prayer of the application, an order was entered authorizing the receivers to issue certificates to the appellant for the amount claimed, which, however, were to be conclusive only as to the amount of the appellant's indebtedness against the railway company. In the decree of foreclosure, February 25, 1898, it was found by the court that the railway company was indebted to the appellant for labor and material performed and supplied by him for construction work on the railway in the sum of $61,241.21, and, further, that conditional certificates had been issued for the amount, in which all questions of rank and priority were reserved. In none of the orders mentioned, nor in the decree of February 25th, were the certificates declared to be a lien on the railway property. But in the final decree of distribution the indebtedness of the appellant was adjudged to be entitled to a lien, subject, however, to the liens and right of priority of payment of the claims included in class A and class B, and of the mortgages executed to the two trust companies. The appellant objects to the classification made by the court, and insists that his demand should be preferred to the claims of the bondholders, and that he should stand at least upon an equal footing with the holders of claims in class B in the distribution of the fund. His contention appears to be predicated upon the assumption that in the decree of distribution he was adjudged to have a mechanic's lien. This contention is evidently based upon a misconception of the decree, since throughout this voluminous record there does not appear a petition, application, bill, plea, or other pleading in which the appellant has asserted a claim to a lien of that nature. We have already decided, in the case of the First National Bank of Houston, that the claims of the bondholders were subject and subordinate to the preferential claims embraced in class A and class B. And it would seem to follow that, if the claim of appellant is not superior to the claims of the bondholders, he would not be entitled to relief. He bases his claim of such superiority on two grounds: (1) That he is entitled to a lien under the laws of Texas; and (2) that, having furnished the labor and material to construct the railway before it went into the hands of receivers, he has an equitable lien on the property to secure the payment of the indebtedness thereby incurred.

1. Whether the appellant, as a contractor to construct a railroad, is entitled to a lien under the laws of Texas to enforce the payment of his claim, is a question which need not be determined on this appeal, as it clearly appears that, if such lien exists, in any case, the appellant failed to take the steps provided by those laws to fix and secure it. By article 3295 of the Revised Statutes of Texas, it is provided:

"In order to fix and secure the lien herewith provided for, it shall be the duty of every original contractor, within four months * * * after the indebtedness shall have accrued, to file his or their contract in the office of the

county clerk of the county in which such property is situated, and cause the same to be recorded in a book to be kept by the county clerk for that purpose."

That the contract of appellant was not filed and recorded in the office of the county clerk is not denied. But it is insisted that the strict letter of the law in reference to filing and recording the contract should not be applied, as, by his intervention in the original suit a few days after the appointment of receivers, he brought his claim to the attention of the court, and was awarded, as evidence of it, receivers' conditional certificates. It is doubtless true that a court of equity would relieve a party from a strict compliance with statutory requirements, where he had used due diligence and manifested a purpose to claim the rights arising under the statute. But laches and neglect are always discountenanced by a court of equity, and nothing can call it into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing. Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; Pennsylvania Mut. Life Ins. Co. v. City of Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626. From the inception of appellant's connection with the case, on January 22, 1896, to the date of the final decree of distribution, November 18, 1899, extending over a period of nearly four years, he never, in any pleading or paper on file, claimed a mechanic's lien. · His demand against the railway company was submitted to the court, and promptly recognized as a valid indebtedness against the company. No lien, however, attached under the orders of the court prior to November 18, 1899, nor was the claim awarded preference. And if any statutory lien ever existed in his favor as a contractor, by his long continued silence when he should have spoken, and unexplained laches, he has waived it. "He who is silent when conscience requires him to speak shall be debarred from speaking when conscience requires him to keep silent."

2. The appellant next insists that as he constructed the railway by his own energy, labor, and money, he is entitled to a lien which should be preferred to that of the bondholders. While it is claimed that the appellant performed work and furnished materials in the work of construction, there is nothing in the record to show how much is due for the one or the other. But, independent of that consideration, it appears that the indebtedness was incurred in the work of original construction, and not for the purpose of operating and maintaining, as a going concern, a railway already in existence. In reference to the latter, the authorities cited in the case of First Nat. Bank v. Ewing et al., ante, announce the doctrine that, within narrow limits, such indebtedness, accruing a short time prior to the receivership, will be given preference over railway mortgages. But, as to indebtedness incurred by a contractor in the work of original construction or reconstruction of the railway, priority of its payment over the mortgage bonds is denied. Railroad Co. v. Cowdrey, 11 Wall. 459, 20 L. Ed. 199; Hale v. Frost, 99 U. S. 389, 25 L. Ed. 419; Railroad Co. v. Hamilton, 134 U. S. 296, 10 Sup. Ct. 546, 33 L. Ed. 905; Dunham v. Railway Co., 1 Wall. 254, 17 L. Ed. 584; Porter v. Steel Co., 120 U. S. 649, 7 Sup. Ct. 1206, 30 L. Ed. 830; Penn v. Calhoun, 121 U. S. 251, 7 Sup. Ct. 906, 30 L. Ed. 915; Lackawanna Iron & Coal

Co. v. Farmers' Loan & Trust Co., 24 C. C. A. 487, 79 Fed. 202; Id., 20 Sup. Ct. 363, Adv. S. U. S. 363, 44 L. Ed. ——.

Holding, as we do, that the classification of the claims, as between the appellant and the bondholders, was properly made, it would seem unnecessary to go further. But, as counsel for the appellant contend with earnestness that the receivers' certificates and certain other claims are not entitled to priority over his own, we will briefly consider this contention. We have shown, in the case of First Nat. Bank v. Ewing et al., that these certificates were not open to attack by the bank, and what was there said applies with much greater force to the present appellant. According to the report of the master, the appellant had issued to him during the receivership receivers' certificates amounting to $62,238.47. Of this amount, $50,513.98 were for ballasting the roadbed, and $11,724.49 for general construction and bridge work. It appears that prior to the decree of final distribution he had disposed of the certificates issued to him. He was, therefore, no stranger to these certificates. At the beginning of the proceeding he waived exceptions to the report of the master recommending their issuance, and agreed that the court should hear and act upon the report without delay. The order of court authorizing their issuance was not excepted to by him; and his counsel prepared the decree of foreclosure, which found that the certificates had been regularly issued pursuant to the prior order of the court, and adjudged them a lien upon the property of the railway company. Subsequently, on April 16, 1898, the appellant filed an answer to the petition of the Union Trust Company, in which the trust company assailed the receivers' certificates. In this answer he averred that the issuance of the certificates was necessary for the protection of the property of the railway company, and for the preservation of its rights and franchises. He further averred (using his own language) "that all the funds realized from said receivers' certificates were faithfully expended in and applied to the preservation and management of said railroad property, whereby the good will and integrity of the enterprise were maintained, which was indispensable, and the interests and accommodation of travel and traffic subserved, and the charter rights, franchises, and property of said railway company protected." The answer further averred that the bondholders were aware that the certificates would be issued, and had ample opportunity to appear and make their objection, but that they had willfully remained inert and inactive, speculating upon chances, and lying idly by, seeing the court and receivers dealing with the property, without protest. It was further averred that the acts and doings of the bondholders "are contrary to equity and good conscience, and operate, as this respondent submits, an estoppel upon the petitioner." To obviate the effect of the appellant's own words as employed in the answer, his counsel suggest that the answer was filed before the master made his report upon the certificates. That is true, but, as evidence that the averments of the answer were made after careful investigation and upon mature deliberation, reference may be made to a petition filed in the cause by defendant on November 8, 1898, praying for counsel fees, in which he alleged that, in order to protect the security of the receivers' certificates, he gave, through his solicit-

ors, the matter of priority a careful investigation upon the law and facts, and filed a lengthy response to the contest of the Union Trust Company. Having, while the owner of a part of the certificates, strenuously endeavored to maintain their integrity and validity, we think that it would be inequitable to permit the appellant to assail them after he has parted with the interest which he originally owned.

After what we have said in the foregoing case of First Nat. Bank v. Ewing et al. in reference to the claim of Ewing & Ring for fees, and a few other claims in class B, it is not deemed essential to pursue the question further than to say that the operating expenses incurred by the receivers during their management and control of the property are entitled to preference over the claim of this appellant. While the demand of the appellant against the railway company is a meritorious one, we cannot, consistently with established principles, adjudge it priority over claims of higher dignity, and displace liens to which it is subordinate. The decree of the circuit court should be affirmed, and it is so ordered.

### (3) Galveston, Houston & Northern Railway Company v. T. W. House et al.

Upon this appeal the specifications of error challenge the ruling of the circuit court refusing to allow state and municipal taxes, with interest, penalties, and costs, and certain right of way claims, to be paid out of the fund in court. The contest is between the appellant, to which the railway was conveyed by the master commissioner at the instance of the purchaser, and the holders of claims to which priority was adjudged. It is insisted by the appellant that taxes, the item which we will first consider, constitute a lien upon the corpus of the property and earnings in the hands of the receiver paramount to all others, and, if not paid out of the earnings, should have priority of payment over other claimants and lienholders, out of the proceeds arising from the sale of the property. On the other hand, it is contended by the appellees that there was no warranty of title, and, applying the maxim caveat emptor; the purchaser took the property subject to the incumbrances resting upon it, including defects which may have existed in the title. That the taxes in question were, under the laws of Texas, a lien upon the railway property, is not questioned by counsel. And it seems to be settled law that such liens are prior to all other liens whatsoever, except judicial costs, which are first to be paid where the property is rightfully in the custody of the court. "It is the imperative duty of the court," said Mr. Chief Justice Fuller in the case of In re Tyler, 149 U. S. 187, 13 Sup. Ct. 791, 37 L. Ed. 696, "to recognize as paramount, and enforce with promptness and vigor, the just claims of the authorities for the prescribed contributions to state and municipal revenue." Georgia v. Atlantic & G. R. Co., 3 Woods, 434, Fed. Cas. No. 5,351; Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963. And it is immaterial how the claim for taxes may be brought to the attention of the court,—whether by the receiver, the master appointed in the cause, the tax collector, or through intervening petitions filed by the state and municipalities interested. In any case, and whenever

properly brought to the court's attention, they should be promptly paid. But, notwithstanding the superior dignity of tax claims, the burden of their payment, under some circumstances, may be cast upon the purchaser at a judicial sale, and this upon the principle that at such sale there is no warranty of title. Osterberg v. Trust Co., 93 U. S. 424, 23 L. Ed. 964; Railway Co. v. Harrison, 37 C. C. A. 615, 96 Fed. 910, citing authorities. In the latter case it is said by the court:

"The general doctrine is well settled that there is no warranty in judicial sales; that the maxim caveat emptor applies, and the purchaser takes the property without recourse for tax liens or other incumbrances or defects in the title."

But the exception to the rule in equity, and recognized in the Harrison Case, is where the decree provides for the satisfaction of liens out of the proceeds of sale or other funds in the registry of the court. The exception is thus stated by the court at page 619, 37 C. C. A., and page 911, 96 Fed.:

"In the argument of counsel on behalf of the appellant this rule is recognized, but with the assertion that it operates only to forbid the purchaser 'from asking that prior liens be paid out of the proceeds of the property sold.' No authority is cited for so limiting its effect, and we are of opinion that the rule applies with equal force to any fund which is in the registry of the court, or in the hands of the receiver, as the earnings or other production of the property involved. Exception to this general rule undoubtedly arises in equity in the following instances: First, where the decree or order for the sale expressly provides for discharging liens or other claims against the property out of the proceeds or other funds coming into court, or where the proceedings or provisions are otherwise inconsistent with such rule; and, second, where there is fraud, concealment, or unfair dealing in the proceedings which entitle the purchaser to equitable relief."

It then becomes necessary to ascertain whether, under a proper construction of the decree, the purchaser at the sale of October 4, 1898, took the property subject to the lien for taxes. It was provided by the decree that the purchaser should take the property as it was held and enjoyed by the Galveston, Laporte & Houston Railway Company, "subject only" (following the language of the decree) "to the liens, in respect to the portions of property enumerated, to the burden of which such sales were specially herein directed to be made; and all persons who are parties to this cause, or quasi parties, by intervening petitions or otherwise, and all persons claiming under said railway company since the execution of the aforesaid mortgage deeds of trust, are hereby forever barred and foreclosed of all right, title, interest, estate, claim, demand, or equity of redemption of, in, or to any of the property herein directed to be sold, when sold, except as herein otherwise specially provided; and all liens, mortgages, equitable charges, claims, or demands of every nature and description, held, owned, or asserted herein by any of such parties or quasi parties to this cause shall be transferred to the proceeds of the sale herein directed to be made, with like but no greater effect than the same appertained to the property itself, and subject to future determination by the court, except as herein otherwise specially provided." The decree, it will be observed, does not, in hæc verba, provide that the purchaser should take the property relieved of the taxes, but that seems to be the plain

meaning of the language employed. He took it subject only to certain enumerated liens, and, upon the principle that "the expression of one thing is the exclusion of the other," he took the property free from all liens and incumbrances except those specifically mentioned. The tax liens were not embraced in the excepted classes, and therefore the appellant, for whom the property was originally purchased by Smith and Broadhead, has the right to resort to the fund in court to secure the payment of the taxes due, and thus relieve it of the tax incumbrances. This conclusion is strongly supported by the order of the court directing the master commissioner to execute a conveyance of the property to Broadhead. It is there adjudged that Broadhead and his assigns "shall take, have, hold, possess, and enjoy the same free from all and singular the claims of the parties complainants, defendants, and interveners herein, as and according to the provisions of the decree and orders of the court in this cause, and from all claims arising during said receivership or prior thereto."

It is also insisted by the appellees that the claim of the appellant for taxes is barred by the order of June 26, 1899, which directed all parties having claims against the receiver or the fund in court, save those who had already intervened or become parties to the suit, and saving the holders of receivers' certificates and of undisputed indebtedness, to intervene in the suit by the 1st day of September, 1899, under the penalty of having their claims barred. This order obviously is without application to the appellant, as its intervention, seeking payment of the taxes in question, was filed June 12, 1899,—some days prior to the date of the order.

It is further contended by the appellees that in no event should interest, penalties, and costs accruing upon the claim for taxes be allowed. In Thomas v. Car. Co., 149 U. S. 116, 117, 13 Sup. Ct. 833, 37 L. Ed. 671, it was said by the court:

"As a general rule, after property of an insolvent passes into the hands of a receiver or of an assignee in insolvency, interest is not allowed on the claims against the funds. The delay in distribution is the act of the law. It is a necessary incident to the settlement of the estate. Williams v. Bank, 4 Metc. (Mass.) 317, 323; Thomas v. Minot, 10 Gray, 263. We see no reason in departing from this rule in a case like the present, where such a claim would be paid out of moneys that fall far short of paying the mortgage debt."

The general rule announced by the supreme court is applicable to cases where the fund is to be shared by creditors without liens, or by those having liens of equal and common rank. But where there are claims of several classes, with liens of different priorities, the holders thereof are entitled to interest down to the date of the decree. Jourolmon v. Ewing, 56 U. S. App. 149, 29 C. C. A. 41, 85 Fed. 103; Central Trust Co. v. Condon, 31 U. S. App. 387, 14 C. C. A. 314, 67 Fed. 84. As we have shown, the lien for taxes is superior to all other claims, except for judicial costs, and practically constitutes a class of its own. There being in the registry of the court more than a sufficient amount to pay the state and municipal taxes and judicial costs, the accrued interest, penalties, and costs should be allowed.

As to the contention of the appellant that right of way claims should be paid out of the fund, we shall have but little to say. When the appellant purchased the property, it took it subject to such defects

of title as existed in reference to lands which had been used by the Galveston, Laporte & Houston Railway Company for right of way purposes. As against such imperfect titles there was no warranty (Waples v. U. S., 110 U. S. 630, 4 Sup. Ct. 225, 28 L. Ed. 272), nor anything in the decree to relieve the appellant of the burden of perfecting them.

It is proper to add that the writer, differing with a majority of the court, is of opinion that the appellant purchased the railway property subject to the lien for taxes, which should be paid by it out of its own funds.

The decree appealed from is amended so as to direct the payment out of the fund in court of the state and municipal taxes as found by the master's report, including principal, interest, penalties, and costs; and, as thus amended, quoad this appeal the decree of the circuit court is affirmed. The costs of this appeal will be paid by the receiver out of the funds in court.

### (4) St. Charles Car Company v. T. W. House et al.

Upon this appeal it becomes our duty to determine whether the claim of the appellant for rolling stock purchased by the receivers should participate with the claims of class B in the distribution of the fund in court. The rolling stock in question, amounting in the aggregate to $66,200, consisted of first-class coaches, mixed coaches, combination passenger, baggage, and express cars, caboose cars, and coal and box cars. The contract by which it was acquired was made January 24, 1896, upon authority of the order of court granting permission to issue receivers' certificates; and pursuant to the contract the receivers, after paying $22,066.66 in cash, executed two promissory notes, of $22,066.66 each, payable to the appellant in one and two years after date, respectively, with interest payable semiannually at the rate of 7 per cent. per annum from date until paid, "and at the rate of ten per centum after maturity." The notes contained the following concluding clause:

"This note is one of two for a like amount * * * this day executed and delivered by us in part payment of the purchase money for certain equipment this day bought by us from the St. Charles Car Company: and the payment of this note is secured by a lease contract or conditional sale of even date herewith, executed by us in favor of the St. Charles Car Company, and of record in the record of chattel mortgages of Harris county, Texas."

The semiannual interest not having been paid at maturity, the appellant, through its attorney, about the 12th day of May, 1897, demanded of the receivers the payment of the money or return of the cars, as provided in the contract. The rolling stock being required in the operation of the railway, the receivers declined to comply with either demand, and retained possession of the cars until May 1, 1899, when they were delivered to the master commissioner as hereinafter mentioned. The decree of foreclosure of February 25, 1898, found:

"That, of the rolling stock belonging to said railway company, the following portions are subject to purchase-money liens upon contracts of conditional sale, viz.: * * * Six passenger coaches, three combination coaches, two caboose cars, fifty box cars, and fifty coal cars, purchased by said receivers from the St. Charles Car Company, subject to a lien for $44,133.32, as it existed on July 24, 1897, with interest as per contract, accrued and to accrue."

By that decree the property, rights, and franchises of the defendant railway company were ordered sold subject to the lien of the appellant; and the court reserved the right, if the purchaser failed to pay off and satisfy the lien within a stated time, to have the rolling stock sold to discharge the same; saving, however, to the appellant the right to resort to any other appropriate remedy for the enforcement of its lien. The purchaser of the property failing to pay for the rolling stock, the appellant on December 10, 1898, presented a petition seeking to have it sold to satisfy its claim. In this petition the appellant, in addition to other relief, prayed that, should the amount realized from the sale be insufficient to pay off and discharge its indebtedness, the deficiency be ordered to be paid as a part of the operating expenses of the receivership. On May 2, 1899, the court entered a decretal order directing the delivery of the rolling stock to the master commissioner for the purpose of being sold. The order contained the following recitation:

"Whereas, on the hearing of the above entitled and numbered cause a final decree was on the 25th day of February, 1898, rendered by this court, in and by which it was considered, adjudged, and decreed that the receivers of the property and effects of the defendant railway company theretofore appointed by this court were justly indebted to the St. Charles Car Company in the sum of $44,133.32 for the purchase money of the personal property hereinafter described, sold, and delivered by the said St. Charles Car Company to the said receivers, which purchase was made by authority of an order from this court; and whereas, the said St. Charles Car Company was in and by said decree considered and adjudged entitled to have and receive of and from said receivers the said sum of $44,133.32, with interest thereon at the rate of ten per cent. per annum from July 24, 1897, and that said indebtedness and interest as aforesaid was considered, adjudged, and decreed to be a first lien, prior in right to all other claims of whatever character against either the defendant the Galveston, Laporte & Houston Railway Company or the said receivers, upon the following property, now in possession of T. W. House, receiver, to wit, six passenger coaches, three combination coaches, two caboose cars, fifty box cars, and fifty coal cars, purchased by said receivers from St. Charles Car Company, subject to a lien for $44,133.32, as it existed on July 24, 1897, with interest as per contract, accrued and to accrue, or such portion thereof as is now in existence." ·

And it was ordered:

"Should the property sell for more than the amount of the said St. Charles Car Company's judgment, interest, and costs, then the amount in excess thereof shall be paid in cash to the said special master commissioner, to be paid into the registry of the court, as hereinbefore provided. The court reserves the right to accept or reject any and all bids. It is further ordered and decreed that in the event the proceeds from the said sale should prove insufficient to fully pay off, satisfy, and discharge said judgment, then the said St. Charles Car Company shall have the right to present to this court its petition to have the deficiency that may be due and owing it paid out of the funds now in the registry of the court, as a part of the operating expenses of the receivership."

In obedience to the order the receivers delivered the rolling stock to the master commissioner, who sold the same at public auction, where it was purchased by the appellant for the sum of $30,500; and this amount, less the expenses of sale amounting to $600, was entered, pursuant to a confirmatory order, as a credit on its claim.

It is obvious that the notes to the appellant and the lease contract contemporaneously executed by the receivers became merged in the

decree of foreclosure and the subsequent order of the court, and since no exceptions were reserved to, nor appeal taken from, them, it is now too late to challenge either their effect or correctness. See above case of First National Bank of Houston v. Ewing & Ring. The decree and subsequent order explicitly adjudged the claim of the appellant to be an indebtedness against the receivers, and the latter by plain inference conferred upon it the right to receive any deficiency resulting from the sale out of the fund in the registry of the court. It is also a significant fact to be considered in this connection that in the reports filed by the receivers from September 1, 1896, to October 14, 1899, the claim of the appellant was invariably referred to as a liability of the receiver; and the rolling stock was used by the receivers in operating the railway for a period exceeding three years, and until its final sale. We have no doubt that this claim is entitled, equally with other claims in class B, to participate in the distribution of the fund.

It is therefore ordered that the final decree of distribution be amended by striking out the item allowing the St. Charles Car Company $2,868.39. and inserting in lieu thereof, in class B, an allowance to the appellant of $14.233.32, balance due on car contract, the same being the principal of the indebtedness due the appellant, less $29,600, the proceeds of the sale of the cars; and, as so amended, the final decree of distribution is affirmed. The costs of this appeal will be paid by the receiver out of the funds in the registry of the court. Ordered accordingly.

## (5) W. C. Corbett v. T. W. House et al.

This appeal raises the question whether the claim of appellant shall be paid in full, to the detriment of other claims assigned to class B. The circuit court awarded preference to appellant's claim and classified it with the receivers' certificates, labor claims, and other operating expenses incurred by the receivers in the management of the property. This classification he objects to, since the creditors included in it will be paid only about 77 per cent. of the par value of their indebtedness, exclusive of interest. By his intervention in the suit the appellant sought to establish the priority of his demand on the ground that the claims assigned to him, amounting to $7,334.15, represented work and labor performed by employés of the receivers during the years 1897 and 1898. Upon an inspection of the master's report it will be observed that, approximately, one-half of the total amount of the claims were severally assigned to him by the superintendent and engineer, the auditor and general freight and passenger agent, station agents, train dispatchers, stenographers, and clerks of the auditor, and superintendent and clerks at stations. The appellant insists that he should be preferred to other creditors in class B, and to certain designated claims in class A, because, under the laws of Texas, laborers' liens are superior to all other liens of every kind and character, and hence the claims thereby secured should be paid in preference to all others except judicial costs. It is questionable whether the assignors, above enumerated, of one-half the claims owned by the appellant, would, in any view of the case, be entitled to laborers' liens under the Texas statutes, which give to mechanics, laborers, and operatives a

103 F.—13

lien to secure the payment of their wages. Milligan v. Railway Co. (Tex. Civ. App.) 46 S. W. 918; Krakaner v. Locke, 6 Tex. Civ. App. 446, 25 S. W. 700; Malcomson v. Wappoo Mills (C. C.) 86 Fed. 192; In re Stryker, 158 N. Y. 526, 53 N. E. 525. But, however that may be, we do not think that either the laborers' lien law or article 1472 of the Revised Statutes of Texas, regulating the distribution of funds that may come into the hands of a receiver of a state court, should or can be construed to have application to the classification of claims and priority of liens accruing against receivers appointed by the courts of the United States. The claims in question were those of employés performing work in the immediate service of receivers duly appointed by a court of the United States having jurisdiction of the cause; and their relative rank and classification of payment were matters to be determined by the court in accordance with the general principles of equity jurisprudence. Thus, it was said by Mr. Justice Story, speaking for the court, in Boyle v. Zacharie, 6 Pet. 658, 8 L. Ed. 536:

"But the acts of Maryland regulating the proceedings on injunctions and other chancery proceedings, and giving certain effects to them in courts of law, are of no force in relation to the courts of the United States. The chancery jurisdiction given by the constitution and laws of the United States is the same in all the states of the Union, and the rule of decision is the same in all. In the exercise of that jurisdiction, the courts of the United States are not governed by the state practice; but the act of congress of 1792, c. 36, has provided that the modes of proceeding in equity suits shall be according to the principles, rules, and usages which belong to courts of equity, as contradistinguished from courts of law. And the settled doctrine of this court is that the remedies in equity are to be administered, not according to the state practice, but according to the practice of courts of equity in the parent country, as contradistinguished from that of courts of law, subject, of course, to the provisions of the acts of congress, and to such alterations and rules as, in the exercise of the powers delegated by those acts, the courts of the United States may from time to time prescribe. Robinson v. Campbell, 3 Wheat. 212, 4 L. Ed. 372; U. S. v. Howland, 4 Wheat. 108, 4 L. Ed. 526. So that, in this view of the matter, the effect of the injunction granted by the circuit court was to be decided by the general principles of courts of equity, and not by any peculiar statute enactments of the state of Maryland."

U. S. v. Howland, 4 Wheat. 108, 4 L. Ed. 526; Neves v. Scott, 13 How. 267, 14 L. Ed. 140; Fordyce v. Du Bose, 87 Tex. 78, 26 S. W. 1050.

In the case last cited, at page 82, 87 Tex., and page 1051, 26 S. W., it was said by the supreme court of Texas:

"The legislature of a state has no more authority to prescribe rules of procedure for courts of the United States, nor to limit the effect of judgments of such courts rendered in the exercise of their constitutional powers, than congress has to prescribe rules for the state courts, or to place limitations upon their judgments within the bounds of the states. * * * The several acts of the legislature upon the subject of receivers do not purport by their language to affect receivers appointed by the federal courts in their official capacity, and courts will construe them so as to embrace such subjects as the legislature had the authority to legislate upon. End. Interp. St. § 271. These acts were not intended to affect the procedure of federal courts as to receivers appointed by such courts."

But it is contended by the appellant that by section 2 of the act of congress of August 13, 1888 (25 Stat. 436), it is made the duty of courts of the United States to obey the directions of the state statutes to which reference has been made. This section provides as follows:

"Sec. 2. That whenever in any cause pending in any court of the United States there shall be a receiver or manager in possession of any property, such receiver or manager shall manage and operate such property according to the requirements of the valid laws of the state in which such property shall be situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. Any receiver or manager who shall willfully violate the provisions of this section shall be deemed guilty of a misdemeanor, and shall, on conviction thereof, be punished by a fine not exceeding three thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

It will be observed that the receiver or manager is enjoined to manage and operate the property pursuant to the requirements of state laws, and for willful violation of his duty he is subject to severe punishment. There is, however, no duty resting upon the court, by virtue of the act, to administer property in its hands agreeably to the laws of the states; and to give it such a strained and unnatural construction would impute to congress the purpose and intention, without the employment of apt and expressive language, to seriously impair the constitutional jurisdiction of the courts of the United States in matters of equitable cognizance. It is evident that the act of congress has no application to the present case.

In reference to the receivers' certificates to which objection is made by the appellant, we think that enough has been said in the cases of First Nat. Bank v. Ewing et al. and Smith v. House et al., ante, to show that the claims thereby represented are entitled to participate in the fund equally with the indebtedness of this appellant. And, after a careful consideration of the points raised and discussed by counsel, we are of opinion, without giving special attention to other assignments of error which are very general in their nature, that, while slight errors may have been committed, the ruling of the court was substantially correct in its classification of claims which accrued for operating expenses while the railway was managed and operated under the direction of the court. The rule for the payment of such claims, and the one which the circuit court seems to have followed, was clearly laid down in Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 481, 6 Sup. Ct. 834, 29 L. Ed. 979, where it was said by Mr. Justice Blatchford, speaking for a unanimous court:

"We are of opinion that (with the exception of debts for taxes and receivers' certificates issued to borrow money to pay taxes. or to discharge tax liens) there should be no priority or preference among the debts and claims, whether receivers' certificates or other debts, which are allowed precedence over the mortgage bonds of any road, but that they should all stand alike."

The decree of the circuit court should be affirmed, and it is so ordered.