## MALCOMSON v. WAPPOO MILLS.

(Circuit Court, D. South Carolina. March 21, 1898.)

1. LICENSE TO MINE AND REMOVE PHOSPHATIC DEPOSITS — ROYALTIES—TITLE TO PRODUCT.
   Rev. St. S. C. § 102, authorizes the phosphate commissioners to issue licenses to mine and remove phosphatic rock and deposits from the bed of the Coosaw river, etc., and provides that parties so licensed shall be deemed agents of the state, and each ton of the product of such mining operations shall be deemed the property of the state, "until the said parties shall have paid the royalty thereon fixed by the board." A licensee mortgaged its mined product; owing the state the royalty thereon, and a large amount for unpaid royalty on product sold. Held, that such mortgage was a superior lien to the claim of the state for the royalty on the product sold; the mortgagee having no knowledge of such claim.

2. SAME—RIGHTS OF THE STATE—PAST-DUE ROYALTY — CONTROL OF PRODUCT.
   Under Rev. St. S. C. § 102, which provides that mining licensees of phosphatic territory shall be deemed agents of the state, and that each ton of the product of mining operations shall be deemed the property of the state until the royalty thereon is paid, the state can refuse, except as against bona fide purchasers without notice, to surrender its control of any portion of such product until all past-due royalty under the license, on product disposed of, is paid.

3. MECHANICS' LIENS — CONSTRUCTION OF STATUTE — "LABORERS" AND "EMPLOYES."
   Const. S. C. art. 3, § 17, provides that every act shall relate to but one subject, and that shall be expressed in the title. 22 S. C. St. at Large, p. 502, is entitled "An act to provide for laborers' liens." The word "laborer" is not used in the body of the act, giving to employés of factories, mines, etc., a lien for their wages or salaries. Held, that the word "employés" must be restricted to mean only such as are laborers, and neither the superintendent nor bookkeeper of a mining company comes within this term.

Wm. A. Barber, Atty. Gen., for petitioner.
Smythe, Lee & Frost, in charge of cause.
Charles Inglesley, for the Bank of Charleston, mortgagee.
Mordecai & Gadsden, representing labor liens.

SIMONTON, Circuit Judge. This case comes up on the intervention of the state of South Carolina. The Farmers' Mining Company obtained a license to dig and mine phosphate rock and phosphate deposits in the waters of Coosaw river, a navigable stream in South Carolina, under the act of assembly of 1890 (Rev. St. S. C. § 102). The Farmers' Mining Company went into the hands of the receiver in this case on the 18th day of October, 1897. At that date there were in the hands of the company 5,584 tons of phosphate rock, mined and removed. At that date the Farmers' Mining Company owed the state, for royalty due and unpaid on rock dug, mined, and shipped, the sum of $12,883.50. The royalty on these 5,584 tons has not yet been paid. This royalty is at the rate of 25 cents per ton. On the 4th day of October, 1897, the Farmers' Mining Company executed to the Bank of Charleston as collateral security for a loan of $5,000, 5,000 tons of these 5,584 tons, which mortgage is still unsatisfied. One or more facts must be stated, to understand properly the issues now raised: There were on hand on 1st October, 1897, 4,389 tons of rock. Between the 1st and 15th October were mined 2,195 tons of rock,—in all, 6,584 tons. Of these were shipped 1,000 tons, leaving 5,584 tons. The laborers and employés engaged in producing this rock claim a lien for their wages for the period between the 1st and 15th October,—one-half month. There is a large number of unsecured creditors of the Farmers' Mining Company, and it is insolvent. The paramount right of the state to the royalty of 25 cents on each ton of these 5,584 tons is recognized and admitted.

The intervention raises the question as to the disposition of this rock, or of the proceeds of its sale. The attorney general, on behalf of the state, contends that this rock is subject, not only to the payment of the royalty to be paid on each ton thereof, but also to the payment of the sum due to the state by the Farmers' Mining Company on rock heretofore dug, mined, and shipped by that company, upon which it has not been paid any royalty, and that this is a preferred claim over all other claims whatever. In effect, this is setting up a lien, "for whenever the law gives the creditor a right to have a debt satisfied from the proceeds of property, or before the property can be otherwise disposed of, it gives a lien on such property to secure the payment of this debt." Chase, C. J., in Re Wynne, Fed. Cas. No. 18,117. The Bank of Charleston sets up the recorded legal lien of its mortgage, and claims priority of payment, subject to the royalty of 25 cents per ton, of the 5,000 tons in its mortgage. The laborers and employés, whose respective demands will be detailed hereafter, claim the lien for wages secured under the act of assembly of South Carolina of 1897 (22 St. at Large, p. 502). The general unsecured creditors deny the lien of the state for anything else than the royalty of 25 cents per ton on each ton of the 5,584 tons, and insist that as to the royalty un-

86 F.—13

paid on rock heretofore dug, mined, and shipped, the state ranks only as a general creditor.

1. Does the statute of South Carolina secure to the state the lien it claims? The claim of the laborers and employés will be stated hereafter. Has the state the right to obtain priority of payment in the proceeds of this rock for so much of its claim as arises from unpaid royalty on other rock dug and mined in Coosaw river under the same license? The solution of this question must be found in the statute providing for the license. The statute gives the board of phosphate commissioners authority and direction to take possession and control of the Coosaw river phosphate territory, and to issue licenses to mine therein and remove phosphate rock and phosphatic deposits therefrom in like manner as is now provided by law for other navigable streams and waters of the state. Then comes this proviso, which evidently is not used in its ordinary sense, excepting the clause covered by it from the provisions of the statute, but to quality the operation of the statute, and as a conjunction to the preceding paragraph (Railroad Co. v. Smith, 128 U. S. 174, 9 Sup. Ct. 47):

"Provided that such parties so licensed or authorized shall be deemed agents of the state, and each ton of phosphate rock or phosphatic deposits, the product of such mining operations, shall be deemed the property of the state until the said parties shall have paid thereon a royalty to be fixed by the board at not exceeding $2 per ton on each ton of phosphate rock or phosphatic deposit dug, mined and removed."

The royalty, as has been seen, was fixed at 25 cents per ton.

The state is the absolute owner of the beds of all the navigable streams and waters of the state (State v. Pacific Guano Co., 22 S. C. 50), and of their contents (Id.). Coosaw river is a navigable stream. Under this statute the state carefully conserves its right and title to the phosphate rock and phosphatic deposits in the bed of Coosaw river—First, by granting a license to mine therein only to its own agents; and, second, by asserting its ownership in the product of their work,—this ownership to continue until the parties shall have paid thereon a royalty as fixed by law. Then the ownership of the state ceases. As no precise time is set for the payment of this royalty, it can be paid at any time; and its payment extinguishes the title of the state, unless, from a change of circumstances, some right or equity intervened. The statute uses these words:

"And each ton of phosphate rock or phosphatic deposit, the product of such mining operations, shall be deemed the property of the state until the said parties shall have paid thereon a royalty."

There are three words which contain the essence of this statute, —"each," "until," "thereon." What is the subject-matter? Each ton. What is said of it? It is deemed the property of the state. How long? Until the royalty has been paid thereon. "Each" is defined thus:

"Every one of any number or numerical aggregate, considered individually, equivalent to the adjectival phrase 'each one,'—as, each went his way; each had two; each of them was of a different size (that is, from all the others, or from every one else in the number)." Cent. Dict.

The language "each ton," then, means each ton, taken severally, individually, shall be deemed the property of the state until the said parties have paid the royalty thereon; that is, on that individual ton. The royalty is on each ton, is measured on each ton as the unit, and that ton is the property of the state until this specific royalty is paid on it. Then it ceases to be property of the state. If this be so, then nothing remains to devest the right of property of the state in each of the tons mined and removed but to pay the royalty on it. That would be the effect of the other construction. This phosphate rock is dug, mined, and removed for commercial purposes. It is a large factor in the exports of the state. It is dug, mined, and prepared for sale, and for sale, not in bulk (that is, not of the whole product at one time to one purchaser), but in parcels. Out of a pile of 5,000 tons, 1,000 tons are sold, and are put in progress of loading for export. According to the view expressed by the attorney general, these 1,000 tons do not cease to be the property of the state, and become the undisputed property of the miner, or his assigns, until not only the royalty on each ton of the 1,000 tons is paid, but until all dues to the state by the mining company are fully paid and satisfied. The property thus being in the state, it could assert its right anywhere, and retake the rock into possession. Who then could safely purchase phosphate rock, if a safe title depended upon the release and satisfaction of a claim unadjusted, perhaps disputed? Such a construction would destroy commercial dealings in phosphate rock, and defeat the whole purpose of the statute, which was to utilize the phosphate property of the state by inducing persons to mine it. If, however, it be said that one can purchase phosphate rock, and if the royalty be paid, or provision be made for its payment, he could get a good title, without more, then the position taken by the Bank of Charleston can be sustained. A mortgagee is a purchaser, and can occupy the position and be entitled to the protection of a bona fide purchaser without notice. Haynsworth v. Bischoff, 6 S. C. 159. It is said that the bank does not occupy this favored position, because it was put on notice by the statute. But the statute declares that the state is the owner of the property until the royalty has been paid. What that royalty is, is matter of public record. Of that the mortgagee must take notice, and so holds its mortgage subject to it. But what notice had it of an outstanding claim for royalty on other rock not in possession of its mortgagor, and long since shipped by the mortgagor? How could it ascertain the amount and character of this? A special agent is appointed by the state for the purpose of supervising these phosphate companies. The board of phosphate commissioners (high functionaries) are charged with the protection of the interests of the state. How could the bank know, or be presumed to know, or be made to lose for not knowing, that the Farmers' Mining Company, instead of paying the royalty on the rock removed by it, was indulged by the state officials, and given credit for large sums, the payment of which the law made a condition precedent to their handling this rock? To hold a purchase, absolute or qualified, affected by the lien of a claim like this, would be protecting a secret lien,—a practice the law abhors. The attorney general, in his argument, took the position first that the

rock, the declared property of the state, having been mined by the agents of the state, and so in their possession as its agents and therefore in the possession of the state, it has the right to maintain that possession and to hold it until all the royalty on this specific rock, and all other claims it has on any account against this same agent, are fully satisfied. What force will be given to this position as against the Farmers' Mining Company and its unsecured creditors will be considered hereafter. But the controversy between the state and the bank of Charleston is between a bona fide purchaser, without notice, holding a legal, recorded lien, and the state, which sets up a secret lien; or, to put it in another way, the controversy is between a legal, recorded lien and an equity or an equitable lien. Even were the equities equal, the law must prevail. The attorney general presses the analogy between the position occupied by the state in this case and that of a mortgagee of a chattel, who has foreclosed his mortgage, sold the property, and is in possession of the proceeds. He has unquestionably a right to use these proceeds first for the extinguishment of the mortgage debt, and then for the payment of any lawful debt held by him against the mortgagor. McLendon v. Wells, 20 S. C. 514; Reese v. Lyon, Id. 17; Walling v. Aiken, McMul. Eq. 1. The ratio decidendi of these causes is this: By a chattel mortgage the legal title passes to the mortgagee. On breach of condition the whole title passes. By foreclosing, the mortgagee exercises his right of property. Thenceforward his relation to the mortgagor changes. He becomes the debtor to the mortgagor for the surplus remaining after paying the mortgage. This is a money demand, and subject to all defenses by way of set-off or counterclaim which any other money demand has. But if, upon the execution of the chattel mortgage, or soon thereafter, before foreclosure, the mortgagor has executed a second mortgage, or has assigned to a third party, for value, his interest in the surplus, and of this had given notice to the first mortgagee, it is clear that the latter could not retain such surplus. It is difficult to see any analogy between this condition of things and the relation between the miner and the state. The state has not sold, has taken no steps to sell, has no provision made for the sale by it of, the rock. The miner is compensated for work done in utilizing and making merchantable the property of the state, with the privilege, on paying a royalty, of making it his property. The priority of the mortgage of the Bank of Charleston is recognized.

2. A very difficult question, dependent on very different principles, arises upon the controversy between the state and the general creditors. These creditors have no lien or special interest in the property. They have a claim upon the mining company,—an open claim. The only connection they have with this rock or its proceeds is through the mining company, and their only claim is against its rights in this rock. A judgment cannot take precedence of an unrecorded mortgage. Hampton v. Levy, 1 McCord, Ch. 107. The reason is that an unsecured creditor, even after judgment, cannot take any greater right than the judgment debtor could. And, as the debtor is bound by the mortgage, so the creditor is, also. The payment of the money under these circumstances to the judgment creditor would be in ex-

oneration and relief of the debtor, and for his benefit, in despite of the mortgage contract which bound him. Could the Farmers' Mining Company, if no receiver had been appointed, resist this claim of the state? Could this court aid the company if it did resist the claim? The rock mined was the property of the state. When the mining company got it out, it was the agent of the state, and the rock continued, under the terms of the license, to be the property of the state until the royalty was paid. The appointment of the receiver makes no change in the title or rights of property. It only puts him in possession for the benefit of the party ultimately entitled. Union Nat. Bank of Chicago v. Bank of Kansas City, 136 U. S. 223, 10 Sup. Ct. 1013. The royalty has not yet been paid. The rock being in possession of the state through its agent, and the possession of the receiver being for the real owner, the state has an equity, before surrendering the possession, to require its agent to settle up all outstanding accounts between them,—especially so as the agency now ceases and determines. If the Farmers' Mining Company were not insolvent, and were seeking the possession of this rock, at the same time being largely indebted to the state for other rock, would it not be inequitable to require the surrender of this rock, the other accounts being unpaid, and allow the mining company to spend the proceeds, leaving the state unpaid? If in the case at bar the proceeds of this rock be turned over to general creditors, we would be taking the property of the state, and applying its proceeds to the exoneration of its debtor, and compelling it to come in and take a share with others in the proceeds of the sale of its own property; these others having no lien upon or claim on the property, nor in any way protected by an estoppel working against the state, if any such estoppel could exist. It is familiar law that an agent in possession of the property of his principal can retain possession of that property until his money demands upon the transactions between himself and his principal have been adjusted and settled. Is there not a correlative right in the principal, in control of property in which his agent has an interest growing out of the agency, to maintain that control until the money demands in the transactions between himself and his agent are adjusted and settled? This right cannot strictly be called a lien in favor of the state. The conclusion proceeds on the idea that the rock in place was, and after the mining is, the property of the state. No one can be said to have a lien on his own property. But it is more correct to say that, when the licensee seeks to obtain control of the rock and its proceeds under the license contract, it is perfectly competent for the state to refuse to surrender its control of the rock until the licensee shall pay up all past-due royalty which, in breach of this same contract, he has heretofore omitted to pay. This conclusion in no wise conflicts with that reached in the matter of the mortgage of the Bank of Charleston. There the mining company, in due course of business, mortgaged the rock to the bank. It thus became a bona fide purchaser for value, with no notice of any other claim on the part of the state but for the 25 cents a ton royalty. This prevailing equity secures it. In the branch of the case now under discussion there is no lien and no equity antagonizing the state.

And, even were there an equal equity with that of the state, the equities being equal, the law must prevail for the state. When the lien of the mortgage of the Bank of Charleston is satisfied, the remainder of the proceeds of the sale of this rock must be applied towards the debt due to the state, less any lien the laborers may have.

As to the laborers: There is no question that all who come within this term, "laborers," are by the express language of the act entitled to a lien for the wages due. These are from the 1st to 15th October, —one-half month. This is not denied. But it appears that in the list is the name of Mr. Lawton, who was the superintendent of the mining operations, and of Mr. Titsell, who was assistant in the office as bookkeeper. Are they within the protection of the act? What was the intent of this act? The constitution of the state of South Carolina has rendered unnecessary much of the research formerly needed in order to discover the intent of a statute. The refined and complicated rules laid down by Dwarris and other text writers need not be closely examined. The state constitution gives a key to the statute, and that is its title. "Every act or resolution having the force of law shall relate to but one subject and that shall be expressed in its title." Art. 3, § 17. We look, then, to the title of the act, and the enactment must express the same purpose as the title, or the act is void. The title of this act is, "An act to provide for laborer's lien." The body of the act gives to all employés in factories, mines, and so forth, a lien, whether they be employed either by the day or month, whether the contract be in writing or not, to the extent of the salary or wages that may be due. The word "laborer" does not appear in the body of the act. To sustain the act,—and that is a primary law of interpretation ("Ut res magis valeat quam pereat"),—the word "laborers" must be synonymous with the word "employés"; and, as the word "laborers" is used in the title, the word "employés," used in the body of the act, must be so restricted as to mean such employés as are laborers. This being so, neither the superintendent nor the bookkeeper comes within this term. Let a decree be prepared in accordance with this opinion.