

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable John D. Reed, Commissioner
Bureau of Labor Statistics
Austin, Texas

Dear Sir:

Opinion No. O-3980
Re: Are stenographers, bookkeepers,
etc., to be included in the
term "laborers", in construing
Article 5221a, V. A. C. S.?

We have given careful consideration to your opinion
request of recent date in which you seek our construction
and determination of the meaning of the word "laborer" as
used in the Texas Emigrant Agency Law.

This legislation was enacted in its present form
by the passage of Chapter 96 of the General Laws of the
Forty-first Legislature at its Second Called Session in
1929. It became effective in due course, following its re-
ceipt in the office of the Secretary of State without the
signature of the Governor, and is printed officially at
page 203 of the General Laws of Texas, 41st Legislature,
Second and Third Called Sessions, 1929. In Vernon's Anno-
tated Civil Statutes, it is classified as Article 5221a.

In order to understand your question properly,
we deem it expedient to copy herein Section 1 of the Act,
containing the definition of the term "emigrant agent":

"Secion 1. The term 'emigrant agent'
as used in this Act means every person, firm,
corporation or association of persons engaged
in the business of hiring, enticing, or solicit-
ing laborers in this State to be employed be-
yond the limits of this State and is also
meant to include every person, firm, partner-
ship, corporation or association of persons
maintaining an office to hire, entice, or solicit
laborers to be employed beyond the limits of

Honorable John D. Reed, Commissioner, Page 2

this State; and is also meant to include
every person who, as an independent con-
tractor or otherwise than as an agent of a
duly licensed emigrant agent procures, or
undertakes to procure, or assist in pro-
curing laborers for an emigrant agent; and
every emigrant agent shall be termed and
held to be doing business as such in each
and every County wherein he, in person, or
through an agent, hires, entices or solicits
any laborer to be employed beyond the
limits of the State."

There are eleven sections of the legislation, but
we will include no other portions of it here except the
emergency clause, since you are no doubt familiar with all
of its terms and provisions. The Act regulates and provides
for supervision of emigrant agents as above defined, but in
no part of same is the word "laborer" defined, and you wish
to know whether "stenographers, bookkeepers, etc." are to
be considered "laborers" within its terms.

We here quote the emergency clause, emphasizing
certain portions thereof, in our effort to ascertain the
legislative intent:

"The fact that the State of Texas has
come to be recognized as a fruitful field for
the activities of Emigrant Agents and the
further fact that a large per centage of the
individuals solicited by said agents are un-
educated and not fully cognizant of their
rights or of business methods in protecting
and securing their rights and are susceptible
of being over influenced and the further fact
that there exists no law providing for a
reasonable regulation of said business, creates
an emergency and an imperative public necessity
that the constitutional rule requiring bills
to be read on three several days be suspend-
ed, and the same is hereby suspended, and that
this Act become effective from and after its
passage, and it is so enacted." (Underscoring
ours.)

Honorable John D. Reed, Commissioner, Page 3

The emergency clause of a bill passed by the Legislature may be looked to for aid in ascertaining the legislative intent, regardless of whether the law becomes immediately effective. See 39 Tex. Jur. 228, ¶ 121, and cases cited under note 18, especially Interstate Forwarding Co. v. Vineyard, (Civ. App.) 3 S. W. (2d) 947, reversed 121 Tex. 289, 49 S. W. (2d) 403, where the emergency clause of a bill was held clearly to show the purpose of the Legislature.

In 39 Texas Jurisprudence 194, ¶ 103, et seq., it is said:

"In harmony with principles heretofore stated, the words of a statute are accorded the meaning that comports with the legislative intention, otherwise stated, the rule is that statutory words are to be interpreted according to the sense in which they were evidently used by the Legislature. Thus when necessary to fulfill the legislative intent, the meaning of words may be extended beyond or restricted within their natural import. But, as we have seen ( ¶ 93), the legislative intention is primarily found in the language of the statute, and therefore the words employed are ordinarily given their plain meaning 'without regard to the distinction usually made between the construction of penal laws and laws upon other subjects,' unless the act clearly shows that they were used in some other sense. . . .

"In determining the meaning of a word employed in a statute, the inquiry is not as to its abstract meaning but as to the sense in which it is used. It is proper and sometimes necessary to consult a dictionary to ascertain the meaning to be attached to a word. And it may be profitable, as throwing light upon a proper construction to be given a statutory provision, to note the accepted legal definition of a word used therein. But one word may often be used to express different ideas, and it will not ordinarily do to adopt a restricted or specific definition, especially where the meaning of the word in

Honorable John D. Reed, Commissioner, Page 4

question is as variant as the connections
in which it may be employed. Hence in
every case the particular meaning depends
upon, and must be determined by, the con-
text and subject matter, and the evident
intention of the Legislature."

Applying the above principles of the law, we find
the following definition of the word "laborer" in Webster's
New International Dictionary, 2nd Edition:

"One who labors; specif.: one who does
physical labor; one who works at a toilsome
occupation; esp. a person who does work that
requires strength rather than skill, as dis-
tinguished from artisans and from the pro-
fessional classes." (Emphasis in dictionary.)

In the same authority, the word "bookkeeper" is de-
fined:

"One who keeps accounts; one whose
business or profession is bookkeeping."
(Emphasis ours)

And, stenographer:

"One who is skilled in stenography;
a writer of shorthand; often, one employed
to do stenographic work." (Emphasis ours.)

We find many decisions of various appellate courts
throughout the country wherein there is discussion of the
meaning of the word "laborer" in interpreting statutes giv-
ing a lien to laborers; in acts exempting the wages of la-
borers from garnishment; and in legislation giving preference
to employees of an insolvent corporation. We have explored
a goodly number of these cases in an effort to gain light to
enable us to arrive at a correct solution of the problem of
the meaning of the term in the instant situation.

In the case of Milligan v. San Antonio & Gulf
Shore Ry. Co., (Tex. Civ. App.) 46 S. W. 918, the court had
before it a provision of the Code of 1895 providing that all
"mechanics, laborers and operatives" who performed labor,
or worked with tools, teams or otherwise, in the construc-

792

tion, operation or repair of any railroad, or equipment of a railroad, and to whom wages were due for such work, or for the work of tools or teams thus employed, or for work otherwise performed, should have a lien upon such railroad therefor. Held: A bookkeeper and auditor, in the employ of the construction company which built a railroad was not entitled to a lien thereon for the amount due him for his services. In the course of the opinion it was noted that the bookkeeper and auditor did not claim to come under the deßignation "mechanic" or "operative", and the decision is squarely upon the question of whether such a person was a "laborer" within the spirit and meaning of the statute. In this case, the court said a bookkeeper and auditor was not to be considered a "laborer".

In the Federal case of United States v. Union Bank of Canada, (Cir. Ct. App. N. Y.) 262 F. 91, 8 A. L. R. 1438, the word "laborer" as used in the contract labor provisions of Immigration Acts was limited to manual laborers, and neither a bookkeeper in a bank nor a clerk in a steamship office was considered within the prohibition of an act of Congress making it a misdemeanor for any person to prepay the transportation of contract laborers migrating into the United States.

According to the New York case of Cochran v. A. S. Baker Co., 61 N. Y. S. 724, 30 Misc. 48, a bookkeeper was not a "laborer" within an act preferring the wages of laborers of insolvent corporations.

And in Louisiana, a bookkeeper for a stave mill was not such a "laborer" in the eyes of that state's court in the case of Dodd v. Horon, 121 So. 323, 324, as would entitle him to a lien on the product of the mill for wages.

Illinois has decided that a bookkeeper is neither a laborer nor a servant, in view of an act to protect employees and laborers in their claim for wages and the act concerning voluntary assignments, relating to preferred claims for wages. Signor v. Webb, 44 Ill. App. 338.

An employee of a contractor, who kept the books of his employer, superintended a part of the work, and was foreman of a squad of laborers, cannot be said as a matter of law, to be such a "laborer" as would be entitled to a lien for his work in Georgia. See the case of Tuck v.

Honorable John D. Reed, Commissioner, Page 6

Moss Mfg. Co., 127 Ga. 727, 56 S. E. 1001, at p. 1003.

In Washington, the court in the case of Cavanaugh v. Art Hardware & Mfg. Co., 124 Wash. 243, 214 P. 152, 154, denied a bookkeeper a prior lien on the property of his employer, holding he was not a "laborer"; that the term "labor" as used in the labor lien statute of that state was intended to be confined to its more common and restricted meaning, as manual exercise of a toilsome nature, exertion of muscular force producing weariness.

In addition to the Federal case of United States v. Union Bank of Canada, supra, we find that the Circuit Court of South Carolina in Malcomson v. Wappoo Mills, 86 F. 192, at p. 198, held a bookkeeper of a mining company not to be a "laborer" within the title of the statute, the caption reading "An act to provide for laborer's liens."

Some states have cases contra:  New Jersey, Consolidated Coal Co. v. Keystone Chemical Co., 54 N. J. Eq. 309, 35 A. 157; New York, Brown v.Fence Co., 52 Hun. 151, 5 N. Y. S. 95; Georgia, Lamar v. Chisholm, 77 Ga. 306.

The great weight of authority seems to be conclusive that a bookkeeper is not to be considered as coming within the classification of a "laborer". In addition to the Texas case of Milligan v. Ry. Co., supra, while the following do not involve a bookkeeper, see:  Railway Co. v. Mathews, 75 Tex. 94, 12 S. W. 976; St. Louis S. W. Ry. Co. v. Lyle, Tex., 26 S. W. 264; Dunn v. Hawkins, Tex. Civ. App., 127 S. W. (2d) 983; Bell Oil & Refining Co. v. Price, Tex. Civ. App., 251 S. W. 559.

With reference to stenographers, we have searched diligently to find cases passing upon the classification to which they properly belong.  The only decisions we have been able to find in any jurisdiction are the Georgia cases of Cohen v. Aldrich, decided in 1908 by the Court of Appeals of Georgia, 5 Ga. App. 256, 62 S. E. 1015, following Abrahams v. Anderson, 80 Ga. 570, 5 S. E. 778, 12 Am. St. Rep. 274.  The Cohen case has been cited in the case of Langley Mfg. Co. v. Frey & Co., 10 Ga. App. 733, 73 S. E. 1074, without comment otherwise; and in the Washington case of State v. Rossman, 93 Wash. 530, 161 P. 349, the case was cited as authority that a stenographer and bookkeeper was

Honorable John D. Reed, Commissioner, Page 7

a "worker" within the meaning of the employment agency statute of that state.

In the Cohen case, supra, it was held that a stenographer to the assistant manager of a corporation, who received letters by dictation and transcribed the same, preserved office records, addressed and mailed letters, and performed generally the duties of amanuensis in the office, whose salary was payable semi-monthly, and whose term of service was not fixed, was a "laborer" whose wages were exempt from garnishment. In the Cohen case, however, the court made it clear that the holding was adhered to solely out of respect to the precedent of Abrahams v. Anderson, supra, as note this language:

"If we were authorized to exercise a free intellectual judgment as to the matter, instead of being bound by the precedents, we would not hesitate to hold that Aldrich was not a manual laborer. It is our personal view that Abrahams v. Anderson was incorrectly decided. We are bound by the precedents, and the Abrahams case clearly controls this one."

In the course of the opinion we find the following language:

"That a stenographer is skilled and trained cannot affect the nature of the work he does, although it does affect its character. After acquiring the trade, the test is the method of carrying it on. It is difficult to conceive of anything more thoroughly manual than the work of a stenographer. Receiving the sounds from the lips of another, he registers what he hears and reproduces what he receives. He exercises no independence of thought, no initiative, no discretion. The test of his efficiency is his absolute acceptance of what is given him and its return unchanged. If his employer indulges in the pastime of murdering the King's English, he must become a 'particeps criminis,' and join in the assassination. So pronouncedly are the physical faculties involved in stenography that there comes a time when the hand refuses to work, although the mental faculties may be

entirely clear. It is preeminently manual labor, work of the hand."

As stated above, we have found no other cases in any jurisdiction passing upon the question of whether a stenographer is a "laborer". Apparently our Texas courts have never been called upon to write upon the point.

Adverting to the emergency clause of the Texas Emigrant Agency Law, and especially that language we have underscored above, we are impelled to exercise "a free intellectual judgment" with respect to the status of a stenographer in Texas, with due deference to the "precedents" of the great state of Georgia. We are unwilling to say, as applied to our Texas stenographers, that a "large per centage of the individuals . . . are uneducated and not fully cognizant of their rights or of business methods in protecting and securing their rights."

A capable Texas stenographer (And who will say the vast majority of them are not capable?) devotes much time and special study to the attainment of the art. Proficiency comes from tedious hours of steady practice, applied daily by experience. When, perchance, one is unable to pursue the calling with reasonable regularity, a review and additional study is essential to regain the efficient status essential to a proper disposition of the duties.

In the early days of our educational system the youth was apprenticed to a master craftsman in order to learn a trade. The method of apprenticeship maintains to this day, particularly in those crafts and trades carried on by those whom we commonly refer to as laborers.

But no stenographer learns the science of shorthand through the apprenticeship method. The method employed in teaching and learning shorthand is precisely that of formal schooling. The procedure involved is much the same as that practiced with the young educand, who is taught first to form letters into words, and then to compose and read sentences. Many and various are the signs and symbols used and committed to memory, before ultimate attainment of a practical and usable system of shorthand.

Honorable John D. Reed, Commissioner, Page 9

Typewriting and shorthand are formally recognized subjects in the curriculum of the vast majority of our high schools. The subject matter of the modern school curriculum is divided chiefly into two fields, the skill subjects and the humanities, or the practical arts and the fine arts. The skill subjects or practical arts are manifestly composed of those studies which have primarily a vocational aspect. But the fact that the word "art" has become in educational terminology a recognized part of an associative alliance with those learnings and skills which we term basically "practical", is highly indicative of a line of demarcation which must distinguish the subjects described as "practical arts" from the "fine arts" on the one hand, and from wholly mechanical or manual pursuits on the other.

In our educational system we have trade schools in which mechanics and manual training are taught in various forms. There are commercial schools, or business colleges, where bookkeeping and stenography constitute the central core of the curriculum. And there are many Texas high schools where subjects from both the mechanical and the commercial fields are taught by the same formal laboratory method as the sciences. These facts might tend, at first glance, to comport with and lend credence to the reasoning of the Georgia jurist, when he says, with the particular intent of comparing the work of well recognized laboring trades with that of the stenographer:

". . . It is urged that stenography is an 'art', a skillful employment, the result of special study and training, and that proficiency in it is the result of steady practice and experience. . . . Proficiency comes to the bricklayer and carpenter and blacksmith from steady practice and experience, and, they specially study and train . . . Special study and training and steady practice and experience do not of themselves make 'art'."

In another part of the Georgia opinion it is said:

". . . the true distinction is: Does mental labor or manual labor predominate?"

And in this connection we believe is to be found the error in the learned jurist's reasoning. He ignores the literary requisites required by stenography, elements wholly

lacking in bricklaying, carpentering and blacksmithing. The judge claims this is of no account, since if the employer "indulges in the practice of murdering the King's English, he (the stenographer) must become a 'particeps criminis', and join in the assassigation." But it must be remembered that if the employer dictates the word "ain't", it is the stenographer's job to know that an apostrophe must be placed between the letters "n" and "t". And it is a well known fact that many executives do not take the time or bother to dictate all of their letters, but merely issue instructions, leaving the actual composition of the letters to the intellectual acumen of the stenographer. It is in this literary requisite that "art" enters, in addition to manual skill.

The line of demarcation between labor and stenography occurs, we believe, precisely at the point where the stenographer must bring into play, in addition to the required skills of placing signs and symbols on paper and transcribing their meaning by the use of a typewriter, a knowledge of the correct use of letters, grammar, rhetoric, spelling and literary composition. Each of these adjuncts is inherently a phase of literature, the basic subject of the humanities. Any subject, the mastery of which requires to a major degree knowledge of these essentially literary techniques, cannot be classed as exclusively a manual performance, as the Georgia jurist contends. By his own reasoning, once the duties performed are removed from an essentially manual routine, then the one who performs them is not to be classed as a laborer.

Specifically answering your question, we are of the opinion that neither a bookkeeper nor a stenographer, as such, comes within the meaning of the term "laborer" as used in the Texas Emigrant Agency Law.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By _Benjamin Woodall_

Benjamin Woodall
Assistant

OCT 10, 1941

FIRST ASSISTANT
ATTORNEY GENERAL

BW:GO



APPROVED
OPINION
COMMITTEE
BY